# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 23-11184

UNITED STATES OF AMERICA, ex rel., ALEX DOE, Relator,

*Plaintiff-Appellee,*

v.

PLANNED PARENTHOOD FEDERATION
OF AMERICA, INCORPORATED,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, AMARILLO

## EN BANC BRIEF FOR DEFENDANT-APPELLANT

DANNY S. ASHBY
O'MELVENY & MYERS LLP
2801 North Harwood Street,
 Suite 1600
Dallas, Texas 75201
(972) 360-1904
dashby@omm.com

ANTON METLITSKY
O'MELVENY & MYERS LLP
1301 Avenue of the Americas,
 Suite 1700
New York, New York 10019
(212) 326-2291
ametlitsky@omm.com

LEAH GODESKY
L. NICOLE ALLAN
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, California 90067
(310) 246-8501
lgodesky@omm.com
nallan@omm.com

*Attorneys for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Defendant-Appellant:**

Planned Parenthood Federation of America, Inc.
*Represented by* O'Melveny & Myers LLP
Anton Metlitsky
Leah Godesky
Danny S. Ashby
L. Nicole Allan

**Plaintiff-Appellee:**

Relator Alex Doe
*Represented by* Hacker Stephens LLP
Heather Gebelin Hacker
Andrew Bowman Stephens

**Other Parties:**

Defendant Planned Parenthood of Greater Texas, Inc.
Defendant Planned Parenthood Gulf Coast, Inc.
Defendant Planned Parenthood South Texas, Inc.
Defendant Planned Parenthood Cameron County, Inc.
Defendant Planned Parenthood San Antonio, Inc.
*Represented by* Arnold & Porter Kaye Scholer LLP
Christopher M. Odell
Craig D. Margolis
Tirzah S. Lollar
Paula R. Ramer
Alyssa Gerstner
Christian Sheehan

Emily Reeder-Ricchetti
Megan Pieper
Meghan Martin
Marcus Asner
Matthew Diton
Valarie Hays
Jayce Lane Born

*Represented by* Law Office of Blackburn & Brown, LLP
    Ryan Patrick Brown

Plaintiff State of Texas
*Represented by* Office of the Attorney General
    Ken Paxton
    Amy S. Hilton
    William David Wassdorf

United States of America, Real Party in Interest
*Represented by* United States Attorney's Office
    Kenneth G. Coffin
    J. Scott Hogan
    Jamie Yavelberg

State of Louisiana, Real Party in Interest
*Represented by* Office of the Louisiana Attorney General
    Joseph Scott St. John

<u>/s/ *Anton Metlitsky*</u>
Anton Metlitsky

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument in this en banc appeal has been calendared for September 25, 2025.  Dkt. 164.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ......................................... i

STATEMENT REGARDING ORAL ARGUMENT ........................... iii

STATEMENT OF ISSUES ........................................................... 7

    A.    Factual Background ...................................................... 7

        1.    Planned Parenthood's Corporate Structure ................... 7

        2.    Underlying Medicaid Termination Litigation ............... 9

    B.    Procedural Background ............................................... 12

SUMMARY OF ARGUMENT ................................................... 17

STANDARDS OF REVIEW ...................................................... 21

ARGUMENT .......................................................................... 21

    I.    RELATOR'S CLAIMS ARE BARRED TO THE DEGREE THEY ARE BASED ON HIS LEGAL REPRESENTATION THEORY. ................................................................. 22

        A.    L&L's Conduct Is Not Actionable Under Texas, Louisiana, Or Federal Law. ...................................... 22

            1.    Texas Law ....................................................... 22

            2.    Louisiana Law ................................................. 26

            3.    Federal Law ..................................................... 28

        B.    The District Court's Grounds For Rejecting PPFA's Defenses Are Incorrect And Should Be Rejected ........... 33

            1.    Relator Cannot Evade Attorney Immunity By Suing The Attorneys' Employer On A Respondeat Superior Theory. .......................... 33

            2.    The FCA And Its State Analogues Do Not Override Attorney Immunity And Do Not Apply To The Litigation Conduct Alleged Here ............. 41

    II.    THIS COURT HAS APPELLATE JURISDICTION OVER PPFA'S APPEAL. .................................................... 48

        A.    This Court Has Long Held That The Denial Of Attorney Immunity Under Texas Law Is An Immediately Appealable Collateral Order. .................................... 49

iv

**TABLE OF CONTENTS**
**(continued)**

**Page**

B. The Court Likewise Has Jurisdiction To Consider PPFA's Appeal As To Louisiana And Federal Immunity. ...... 51

    1. Denials Of Attorney Immunity Under Louisiana And Federal Law Are Immediately Appealable Under *Troice*. ................................................. 51

    2. In The Alternative, The Court Has Pendent Jurisdiction Over Relator's LMAPIL And FCA Claims. ........................................................ 53

C. The Fact That Some Of Relator's Claims Are Not Subject To Attorney Immunity Does Not Deprive This Court Of Appellate Jurisdiction. ............................. 54

CONCLUSION ................................................................. 56

CERTIFICATE OF SERVICE ........................................... 58

CERTIFICATE OF COMPLIANCE ................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alpert v. Crain, Caton & James P.C.*,
    178 S.W.3d 398 (Tex. App. 2005)..........................................................23, 24, 25

*Auburn Med. Ctr., Inc. v. Andrus*,
    9 F. Supp. 2d 1291 (M.D. Ala. 1998) .................................................................46

*Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
    757 F.2d 676 (5th Cir. 1985)....................................................................35, 36, 53

*BancPass, Inc. v. Highway Toll Admin., L.L.C.*,
    863 F.3d 391 (5th Cir. 2017).............................................................................56

*Batiste v. Theriot*,
    458 F. App'x 351 (5th Cir. 2012) .......................................................................54

*BE & K Constr. Co. v. N.L.R.B.*,
    536 U.S. 516 (2002) ..........................................................................................46

*Behrens v. Pelletier*,
    516 U.S. 299 (1996) ..........................................................................................55

*Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*,
    595 S.W.3d 651 (Tex. 2020)..............................................................................37

*Bill Johnson's Rests., Inc. v. N.L.R.B.*,
    461 U.S. 731 (1983) ..........................................................................................44

*Bradt v. West*,
    892 S.W.2d 56 (Tex. App. 1994)........................................................................41

*Briscoe v. LaHue*,
    460 U.S. 325 (1983) .....................................................................................29, 30

*Brown v. Foti*,
    1994 WL 518187 (E.D. La. Sept. 21, 1994)......................................................35

*Butz v. Economou*,
    438 U.S. 478 (1978) ...................................................................................passim

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) ..........................................................................................44

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Cameron Compress Co. v. Kubecka*,
   283 S.W. 285 (Tex. Civ. App. 1926) ....................................................34

*Cantey Hanger, LLP v. Byrd*,
   467 S.W.3d 477 (Tex. 2015) ....................................... 22, 24, 25, 37

*Castle v. Castle*,
   123 So.3d 1267 (La. Ct. App. 2013) .............................................27

*City of Newport v. Fact Concerts, Inc.*,
   453 U.S. 247 (1981) ...............................................................43

*Congress Square Ltd. P'ship v. Polk*,
   2011 WL 837144 (E.D. La. Mar. 4, 2011) .......................................27

*Deck v. Engineered Laminates*,
   349 F.3d 1253 (10th Cir. 2003) ..................................................45

*DeWitt v. Harris County*,
   904 S.W.2d 650 (Tex. 1995) ......................................................35

*Escobar v. Montee*,
   895 F.3d 387 (5th Cir. 2018) ............................................... 53, 54

*Forest Oil Corp. v. El Rucio Land & Cattle Co.*,
   518 S.W.3d 422 (Tex. 2017) ......................................................42

*Forrester v. White*,
   484 U.S. 219 (1988) ...............................................................29

*Hamed v. Pfeifer*,
   647 N.E.2d 669 (Ind. Ct. App. 1995) ...........................................31

*Haynes & Boone, LLP v. NFTD, LLC*,
   631 S.W.3d 65 (Tex. 2021) ................................................ 24, 37

*Hodgson v. Scarlett*,
   171 Eng. Rep. 362 (C.P. 1817) ........................................... 30, 52

*Imbler v. Pachtman*,
   424 U.S. 409 (1976) ...................................................... 28, 43

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Ironshore Europe DAC v. Schiff Hardin, L.L.P.*,
  912 F.3d 759 (5th Cir. 2019)..................................................................50

*Jameson v. Montgomery*,
  366 So.3d 1210 (La. 2023)........................................................... 35, 42

*Johnson v. Sawyer*,
  47 F.3d 716 (5th Cir. 1995)...................................................................34

*Kelly v. Nichamoff*,
  868 F.3d 371 (5th Cir. 2017)........................................................ 37, 50

*Landry's, Inc. v. Animal Legal Def. Fund*,
  566 S.W.3d 41 (Tex. App. 2018)..........................................................37

*Landry's, Inc. v. Animal Legal Def. Fund*,
  631 S.W.3d 40 (Tex. 2021)........................................................... 24, 37

*Loigman v. Twp. Comm. of Twp. of Middletown*,
  185 N.J. 566 (2006).................................................................................31

*Mi Familia Vota v. Ogg*,
  105 F.4th 313 (5th Cir. 2024) ............................................. 49, 55, 56

*Misita v. Maumoulides*,
  336 So.3d 886 (La. 2022)........................................................................35

*Montalvo v. Sondes*,
  637 So.2d 127 (La. 1994)............................................................ 26, 27, 51

*Morin v. Caire*,
  77 F.3d 116 (5th Cir. 1996)...................................................................54

*Nat'l Mfg. Co. v. United States*,
  210 F.2d 263 (8th Cir. 1954)................................................................34

*Nat'l Sav. Bank of D.C. v. Ward*,
  100 U.S. 195 (1879)................................................................................29

*New Orleans & N.E.R. Co. v. Jopes*,
  142 U.S. 18 (1891)..................................................................................34

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Paul S. Mullin & Assocs., Inc. v. Bassett,*
  632 F. Supp. 532 (D. Del. 1986) .......................................................... 46

*Penalber v. Blount,*
  550 So.2d 577 (La. 1989) ........................................................... 26, 51

*Pierson v. Ray,*
  386 U.S. 547 (1967) .................................................................... 29

*Planned Parenthood Gulf Coast, Inc. v. Gee,*
  862 F.3d 445 (5th Cir. 2017) ......................................................... 11

*Planned Parenthood Gulf Coast, Inc. v. Kliebert,*
  141 F. Supp. 3d 604 (M.D. La. 2015) ................................................ 10

*Planned Parenthood of Greater Tex. v. Kauffman,*
  981 F.3d 347 (5th Cir. 2020) ......................................................... 11

*Planned Parenthood of Greater Tex. v. Smith,*
  236 F. Supp. 3d 974 (W.D. Tex. 2017) ............................................... 11

*Planned Parenthood of Greater Tex. v. Smith,*
  913 F.3d 551 (5th Cir. 2019) ......................................................... 11

*Rehberg v. Paulk,*
  566 U.S. 356 (2012) .................................................................... 29

*Rex v. Skinner,*
  98 Eng. Rep. 529 (K.B. 1772) ..................................................... 30, 52

*Roe v. Patterson,*
  2023 WL 2787956 (E.D. Tex. Apr. 4, 2023) ......................................... 34

*Schmidt v. Cal-Dive Int'l, Inc.,*
  240 F. Supp. 3d 532 (W.D. La. 2017) ................................................ 27

*Shanks v. AlliedSignal, Inc.,*
  169 F.3d 988 (5th Cir. 1999) ......................................................... 15

*Simms v. Seaman,*
  308 Conn. 523 (2013) ................................................................. 31

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sorey v. Kellett,*
  849 F.2d 960 (5th Cir. 1988) ..................................................................49

*Sosa v. DIRECTV, Inc.,*
  437 F.3d 923 (9th Cir. 2006) ......................................................... 44, 46

*Spencer v. Burglass,*
  337 So.2d 596 (La. Ct. App. 1976) ......................................................26

*Spiegel v. Cont'l Ill. Nat'l Bank,*
  609 F. Supp. 1083 (N.D. Ill. 1985) ......................................................46

*Swint v. Chambers Cnty. Comm'n,*
  514 U.S. 35 (1995) ................................................................................53

*Taylor v. McNichols,*
  149 Idaho 826 (2010) ..................................................................... 31, 52

*Taylor v. Tolbert,*
  644 S.W.3d 637 (Tex. 2022) ........................................... 22, 23, 25, 43

*Toles v. Toles,*
  113 S.W.3d 899 (Tex. App. 2003) ..................................... 22, 24, 38

*Tower v. Glover,*
  467 U.S. 914 (1984) ..............................................................................32

*Troice v. Greenberg Traurig, L.L.P.,*
  921 F.3d 501 (5th Cir. 2019) ................................................................42

*Troice v. Proskauer Rose, L.L.P.,*
  816 F.3d 341 (5th Cir. 2016) ....................................................... passim

*Unauthorized Prac. of Law Comm. v. Am. Home Assurance Co.,*
  261 S.W.3d 24 (Tex. 2008) ..................................................................40

*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n,*
  389 U.S. 217 (1967) ..............................................................................40

*United States v. Hylton,*
  710 F.2d 1106 (5th Cir. 1983) ..............................................................44

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*United States v. Pendergraft*,
297 F.3d 1198 (11th Cir. 2002) ................................................... 45, 46

*United States v. Reeves*,
752 F.2d 995 (5th Cir. 1985) ........................................................ 44

*United States v. Texas*,
507 U.S. 529 (1993) ..................................................................... 42

*Vemco, Inc. v. Camardella*,
23 F.3d 129 (6th Cir. 1994) .......................................................... 45

*Walker v. U.S. Dep't of Hous. & Urban Dev.*,
99 F.3d 761 (5th Cir. 1996) .......................................................... 49

*Will v. Hallock*,
546 U.S. 345 (2006) ......................................................... 38, 50, 51

*Williams v. Thaler*,
2013 WL 1249773 (E.D. Tex. Mar. 26, 2013) ............................... 41

*Yaselli v. Goff*,
275 U.S. 503 (1927) ...................................................................... 30

*Youngkin v. Hines*,
546 S.W.3d 675 (Tex. 2018) .................................................... 22, 37

*Zandford v. Nat'l Ass'n of Sec. Dealers, Inc.*,
30 F. Supp. 2d 1 (D.D.C. 1998) ................................................... 36

**Statutes**

18 U.S.C. § 1951(b)(2) ...................................................................... 45

28 U.S.C. § 1291 ............................................................................... 7

28 U.S.C. § 1331 ............................................................................... 7

31 U.S.C. § 3729 ............................................................................... 6

31 U.S.C. § 3732(a) .......................................................................... 7

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

31 U.S.C. § 3732(b) ...................................................................7

42 U.S.C. § 1983 ......................................................................10

La. Civ. Code. Art. 2320 ..........................................................35

La. Rev. Stat. § 46.438.3 ............................................................6

Tex. Civ. Prac. & Rem. Code § 101.021(2) .............................35

Tex. Hum. Res. Code § 36.002 ..................................................6

## Other Authorities

3 William Blackstone, *Commentaries on the Laws of England* (1854) .................30

Restatement (Third) of Agency § 7.03 (2006) .........................34

Restatement (Third) of the Law Governing Lawyers § 56 (2000) ................... 31, 42

Restatement (Third) of the Law Governing Lawyers § 57 (2000) ............ 30, 32, 52

Restatement (Third) of the Law Governing Lawyers § 94 (2000) .........................25

T. Leigh Anenson, *Absolute Immunity from Civil Liability: Lessons for Litigation Lawyers*, 31 Pepp. L. Rev. 915 (2004) .........................................31

## Constitutional Provisions

U.S. Const. amend. I ................................................................44

**INTRODUCTION**

The question in this case is whether an organization can be held liable under the False Claims Act ("FCA") and its Texas and Louisiana analogues based on legal advice and litigation representation provided by attorneys it employs to the attorneys' third-party clients.  In this case, the organization is Planned Parenthood Federation of America, Inc. ("PPFA"), but the question presented applies to any number of organizations, from law firms to non-profits such as Liberty Counsel, the AARP, labor unions, and many others.  For the entire history of this Nation, the answer to this question has been no:  while the filing of false claims is of course actionable regardless whether attorneys are involved, attorneys and their employers cannot be held liable for the legal advice, strategy, and representation the attorneys provide.  The district court's contrary conclusion is incorrect and should be rejected, as a unanimous panel of this Court recognized.

PPFA is a non-profit membership organization that does not itself provide medical or health services, but supports local "affiliate" members that do.  In 2015, Louisiana and Texas sought to terminate three of those affiliate members (the "Affiliate Defendants") from the states' Medicaid programs.  In response, the Affiliate Defendants and individual Medicaid beneficiaries filed suit and obtained federal-court orders enjoining the states from terminating them from Medicaid.  One of these injunctions was upheld by a panel of this Court, but one was vacated several

years later by the en banc Court on procedural grounds.  While the injunctions were in place, the Affiliate Defendants remained enrolled Medicaid providers, providing (and receiving reimbursement for) birth control and other preventative services to Medicaid patients.  No abortion care provided by the Affiliate Defendants was reimbursed through Medicaid.

In 2021, Plaintiff-Appellant Alex Doe ("Relator")[1] brought suit against the Affiliate Defendants under the FCA and two state analogues: the Texas Medicaid Fraud Prevention Act ("TMFPA") and the Louisiana Medical Assistance Programs Integrity Law ("LMAPIL").  His principal claim against the Affiliate Defendants is that once the en banc Court vacated the Texas injunction on procedural grounds, the Affiliate Defendants were required to repay the reimbursements they received for medical care they provided while the injunctions were in place, and their failure to do so violated the statutes' reverse-false-claims provisions.  Relator also alleges an "implied false certification" claim, which includes the difficult-to-understand theory that the Medicaid claims submitted by the Affiliate Defendants while their terminations were enjoined were knowingly false at the time they were submitted because the Affiliate Defendants "knew" they had been terminated from Texas and Louisiana Medicaid—although of course, by federal-court order, they were not

---

[1] Relator's identity is under seal.  *See* ROA.12414.  PPFA uses male pronouns for ease of reading, but nothing should be inferred from this choice.

terminated.  Finally, Relator alleges that the Affiliate Defendants conspired with each other and with PPFA to violate the statutes.

As relevant here, Relator also maintains these causes of action against PPFA (although the district court granted PPFA summary judgment on the reverse-false-claim theory).  But the liability theories just described do not work against PPFA because PPFA does not provide healthcare services or make Medicaid claims.  So Relator presses two separate theories against PPFA.  One is that PPFA could have prevented the Affiliate Defendants from filing false claims but did not.  That theory is not at issue in this appeal.  The second theory, which is at issue here, is that the Affiliate Defendants' lawyers from PPFA's "Litigation & Law" Department ("L&L") provided the Affiliate Defendants with legal services—primarily, obtaining injunctions authorizing the Affiliate Defendants to remain in the Texas and Louisiana Medicaid programs for several years—that "caused" the Affiliate Defendants to violate the FCA and its state analogues.  L&L is a captive law firm within PPFA, separate from its Office of General Counsel, that primarily provides legal advice and representation on certain issues to Planned Parenthood affiliates.

PPFA argued at summary judgment that, under the doctrine of attorney immunity, it cannot be held liable for the legal counsel and representation its attorney-employees provided to their clients, the Affiliate Defendants.  The district court acknowledged that Relator's claims are "predicated on alleged litigation

3

strategies, conduct, and legal maneuvering—orchestrated by PPFA's L&L department—to 'cause' the submission of allegedly false claims and to conspire to violate both federal and state law." ROA.48284. Nor did the district court dispute PPFA's showing that legal representation is generally subject to immunity from suit and liability—indeed, even *Relator* did not dispute that long-established point.

The district court nevertheless rejected PPFA's immunity defense on two grounds: (i) that attorney immunity does not apply because this suit is not against L&L attorneys, but rather against PPFA on a respondeat superior theory, and (ii) that the FCA and its state analogues override any attorney immunity because they apply to anyone who "causes" false claims to be submitted, attorney or not. PPFA appealed this order under the collateral-order doctrine, *see Troice v. Proskauer Rose, L.L.P.*, 816 F.3d 341, 348 (5th Cir. 2016), and a panel of this Court reversed, rejecting both of the district court's grounds for declining to enforce attorney immunity. The panel was correct on both grounds.

*First*, there is no plausible dispute that L&L attorneys themselves are immune from suit in these circumstances. Because Relator sued PPFA for L&L attorneys' conduct under a respondeat superior theory, it follows that the L&L attorneys' immunity also protects PPFA. Any other rule would dangerously undermine the purpose of attorney immunity. The doctrine exists to enable attorneys to provide zealous advocacy without fear of having to stand trial, and a lawsuit against an

attorney's employer would deter such advocacy whether the employer is a law firm, a corporation, or a non-profit membership organization.

*Second*, the district court's conclusion that attorneys can be liable for legal advice and litigation strategy under the FCA and its state analogues ignores several fundamental principles of statutory construction. It ignores the general rule that federal and state statutes are read to adopt common-law immunities unless the statute clearly rejects them. And it ignores the more specific principle that activity protected by the First Amendment—including the filing and prosecution of lawsuits and lobbying of state agencies—does not fall within the scope of generally applicable statutes absent clear legislative intent to include such activity.

Relator has never had any real substantive response. Rather, his argument has been that attorney immunity must be rejected because adopting it here would "blow a hole in" the FCA by immunizing the filing of false claims simply by involving a lawyer. Dkt. 86-1 at 14.[2] That is wrong. If a corporation's filing of a false claim involved lawyers, the corporation is not immunized from FCA liability, which would be predicated in that case not on attorney advice or litigation conduct but on the filing of a false claim. For the same reason, if an attorney's advice or litigation conduct caused the client (including a corporation the attorney works for) to make a

---

[2] Pincites for "Dkt." citations are to ECF page numbers.

false claim, attorney immunity does not immunize the client from FCA liability. Indeed, that doctrine does not even immunize PPFA from all liability *in this case*—Relator's theory that PPFA violated the FCA by failing to stop the Affiliate Defendants from making false claims is meritless for many reasons that are not before the Court on this collateral-order appeal, but it is not precluded by attorney immunity (and thus will move forward regardless of the outcome of this appeal). All that attorney immunity requires—and all that the panel held—is that *legal advice and litigation representation themselves* are not actionable under the FCA.

That conclusion is undoubtedly correct—it reaffirms the narrow, established principle that attorney representation cannot form the basis for liability. The theory of liability that Relator presses is entirely unprecedented. Relator has never cited (and PPFA is not aware of) a single case in which FCA liability was predicated on attorneys recommending and executing a plan to file lawsuits or seek administrative relief. The real sea change would thus be if the Court affirms the district court, inviting new third-party suits challenging attorney representation that no one has attempted to bring before. The Court should reject that anomalous result and enforce the narrow but crucial doctrine of attorney immunity, just as the panel did.

## STATEMENT OF JURISDICTION

Relator brought suit under the FCA, 31 U.S.C. § 3729 *et seq.*, the TMFPA, Tex. Hum. Res. Code § 36.002, and the LMAPIL, La. Rev. Stat. § 46.438.3. The

district court had jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a)&(b). This Court has appellate jurisdiction under 28 U.S.C. § 1291 for the reasons explained in Part II.

## STATEMENT OF ISSUES

The questions presented are:

1.  Whether the attorney-immunity doctrine bars Relator's claims to the extent they are based on L&L's representation of the Affiliate Defendants.

2.  Whether this Court has appellate jurisdiction to consider the district court's denial of attorney immunity.

## STATEMENT OF THE CASE

### A.     Factual Background

#### 1.      Planned Parenthood's Corporate Structure

PPFA is a 501(c)(3) non-profit membership organization. *See* ROA.18243, 18252.  PPFA's mission is to ensure that people can receive comprehensive reproductive and complementary healthcare services.  ROA.28869.  While PPFA does not itself provide any medical or healthcare services, ROA.10156-10160, it supports several dozen member affiliates that do, ROA.10165.  Each PPFA affiliate is a separate 501(c)(3) organization with its own CEO and board of directors. ROA.18328-18330.  Three of those affiliates are Defendants Planned Parenthood

Gulf Coast[3] ("PPGC"), Planned Parenthood of Greater Texas ("PPGT"), and Planned Parenthood South Texas (together with its two subsidiaries, "PPST") (collectively, "Affiliate Defendants").  ROA.18239, 18307-18308.

L&L is a captive law firm within PPFA that provides legal advice and representation on certain public-policy and litigation matters primarily to Planned Parenthood affiliates, and also at times to PPFA.  ROA.20257-20258.  An affiliate's membership in PPFA allows—but does not require—the affiliate to seek legal advice and representation from L&L.  ROA.18284, 18463, 18468-18469.  Access to L&L's pro bono advice and representation is one of the ways PPFA supports its affiliates, in addition to various consulting services, technical assistance, and fundraising.  ROA.18424-18425, 18431-18432, 18441.  Although L&L attorneys are employed by PPFA, they have separate duties of loyalty and confidentiality to each of their clients; when they represent an affiliate on a matter, they have a traditional, privileged attorney-client relationship with that affiliate.  When L&L represents an affiliate or affiliates in litigation, as they did here, "[t]he affiliates are the sole deciders" and "the sole authority" when it comes to "litigation strategy with [L&L]."  ROA.20232.  PPFA has no control over whether L&L represents an

---

[3] PPGC is headquartered in Houston, Texas.  *See* ROA.8303.  From 2010 to March 2021, PPGC operated in Southeast Texas and the Houston metropolitan area. *Id.*  From 2010 through the present, PPGC has also operated in Louisiana.  *Id.*

affiliate in a given matter.  ROA.20231.  L&L does not share privileged affiliate-client information with other affiliates or with PPFA staff outside of L&L.  ROA.18284-18285.

### 2.     Underlying Medicaid Termination Litigation

**a.**  In April 2015, Relator posed as a representative from a tissue-procurement company, gained entry to a PPGC facility, and covertly recorded conversations with PPGC staff regarding the potential for PPGC to facilitate donations of fetal tissue for research purposes.  ROA.95, 97.  Relator publicly released portions of the video footage.  ROA.100-101.

In response, Louisiana and Texas sought to terminate the Affiliate Defendants' enrollment in each state's Medicaid program.  In September 2015, the Louisiana Department of Health ("LDH") issued a notice of termination to PPGC, ROA.129-131, and in October 2015, Texas's Health & Human Services Commission's Office of the Inspector General issued notices of termination to PPGC, PPGT, and PPST.  ROA.133-137.  These notices stated that termination would become administratively final 30 days after issuance if not challenged through the state administrative process.  ROA.19379, 19385, 19391, 19398.

**b.**  The Affiliate Defendants consulted with L&L and other counsel and decided to pursue injunctions of both terminations in federal court rather than challenging them through the state administrative process.  ROA.20487 (PPGT

9

made "legal-strategy decision" to litigate); ROA.19911-19912 (PPST "decided to go the legal route" rather than the administrative process); ROA.8680-8681 (PPGC decided to "fight and litigate" rather than "pursue the administrative appeal process" because it was "in the best interest of our patients").

PPGC, along with individual Medicaid beneficiaries, filed a complaint in the Middle District of Louisiana on October 7, 2015, and all three Affiliate Defendants, also with individual patients, filed another complaint in the Western District of Texas on November 23, 2015. ROA.18150. L&L and other counsel represented both the Affiliate Defendants and individual patients in the ensuing litigation. ROA.8594-8595. The complaints brought suit under 42 U.S.C. § 1983, alleging that the states had violated the free-choice-of-provider right conferred by the Medicaid Act by seeking to terminate the Affiliate Defendants with insufficient evidence. *See Planned Parenthood Gulf Coast, Inc. v. Kliebert*, No. 3:15-cv-00565-JWD-RLB, ECF No. 1 (M.D. La. Aug. 25, 2015; *Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Smith*, No. 1:15-cv-01058-LY, ECF No. 1 (W.D. Tex. Nov. 23, 2015).

This district-court litigation was successful. In October 2015, the Louisiana court enjoined Louisiana from terminating PPGC. *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 652-53 (M.D. La. 2015). A panel of this Court

affirmed. *Planned Parenthood Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 459-60 (5th Cir. 2017), *en banc review denied*, 876 F.3d 699 (2017) (per curiam).

The Texas district court, after hearing three days of testimony about Relator's video and watching the video in its entirety, also entered a preliminary injunction prohibiting Texas from terminating the Affiliate Defendants' Medicaid agreements. *Planned Parenthood of Greater Tex. v. Smith*, 236 F. Supp. 3d 974, 1000 (W.D. Tex. 2017).   A panel of this Court initially affirmed in part, *Planned Parenthood of Greater Tex. v. Smith*, 913 F.3d 551, 554 (5th Cir. 2019), but the en banc Court reversed in November 2020 on the ground that the plaintiffs lacked a private right of action under Section 1983, a position that five other circuits had at that time rejected, *Planned Parenthood of Greater Tex. v. Kauffman*, 981 F.3d 347, 350, 363-68 (5th Cir. 2020) (en banc).

**c.** After *Kauffman*, the Affiliate Defendants consulted with their attorneys— including both L&L and law-firm counsel, ROA.24701, 24709—and successfully obtained Texas's agreement to a one-month grace period before their termination. ROA.8320-8327.   L&L and Husch Blackwell LLP also represented the Affiliate Defendants in seeking state-court mandamus relief temporarily preventing their termination from Texas Medicaid.   ROA.24704-24705.

In Louisiana, meanwhile, the district court rejected the State's request to vacate the injunction in light of *Kauffman*.   *Kliebert*, ECF No. 115-1 (Mar. 8, 2021).

Louisiana later settled that case by allowing PPGC to remain in the Louisiana Medicaid program, and the injunction was vacated in November 2022 per the parties' agreement.  ROA.18213-18219; *Kliebert*, ECF No. 132 (Nov. 10, 2022).  PPGC remains an approved Louisiana Medicaid provider to this day.  ROA.8304.

### B.    Procedural Background

**1.**  Relator filed his complaint on February 5, 2021.  *See* ROA.73-145.  The United States declined intervention, and Texas intervened on only one of Relator's claims (on which PPFA has since obtained summary judgment).  Although the scope of Relator's claims was not clear in his complaint, those claims have been clarified through summary-judgment briefing[4]:

Claims against Affiliate Defendants.  Relator's principal claims are against the Affiliate Defendants and rely on one basic allegation—that even though the federal-court injunctions prohibited their termination from Medicaid for several years, the Affiliate Defendants were actually terminated from Medicaid that whole time, and the Medicaid claims they filed seeking reimbursement for medical services they undisputedly provided while the injunctions were in place were therefore false.  That entirely implausible theory manifests in three separate claims.

---

[4] Because Relator's allegations and theories of liability are identical for his FCA, TMFPA, and LMAPIL claims, PPFA summarizes these claims together.

*First*, Relator (joined by Texas) asserts that once the Texas injunction was vacated, the Affiliate Defendants violated the federal and state reverse-false-claim provisions by failing to repay the Medicaid reimbursements they received for services provided while both injunctions were in place. ROA.111-115.

*Second*, and as relevant to this appeal, Relator (but not Texas) asserts an alternative implied-false-certification theory that the Medicaid claims the Affiliate Defendants submitted for services provided while the injunctions were in place were knowingly false at the time they were made. According to Relator, the Affiliate Defendants knowingly failed to disclose their Medicaid termination even though (i) the state Medicaid agencies had initiated the terminations; (ii) two different federal courts had enjoined the terminations; (iii) the Affiliate Defendants remained on the Medicaid rolls; and (iv) both states continued to reimburse the Affiliate Defendants for services they provided. ROA.10315-10321.

*Third*, Relator (but not Texas) asserts that the Affiliate Defendants conspired with each other and with PPFA to violate the FCA and analogous state statutes, as explained below. ROA.115.

Claims against PPFA. Because PPFA is not a healthcare provider, Relator asserts two different theories against PPFA.

*First*, he alleges that PPFA is liable for "causing" the Affiliate Defendants to violate the FCA, TMFPA, and LMAPIL because L&L attorneys "mastermind[ed]

and orchestrat[ed] a strategy"—namely, to successfully seek federal-court injunctions—"to enable Affiliate Defendants to continue to seek reimbursement from Texas and Louisiana Medicaid after the effective date of their terminations [i.e., 30 days after the termination notices were issued]." ROA.10324-10325. This theory—which this brief refers to as the Legal Representation Theory—was the basis for Relator's (and Texas's) reverse-false-claim count against PPFA (on which PPFA prevailed at summary judgment). ROA.46677-46678. Relator also alleges implied-false-certification and conspiracy claims (which Texas does not join) that are likewise (in the district court's words) "predicated on alleged litigation strategies, conduct, and legal maneuvering—orchestrated by PPFA's L&L department—to 'cause' the submission of allegedly false claims and to conspire to violate both federal and state law." ROA.48284.

*Second*, Relator alleges that PPFA "caused" the Affiliate Defendants to submit false claims because PPFA generally "controlled" the Affiliate Defendants, knew they were filing false claims, and failed to stop them (what this brief will refer to as the Control Theory). ROA.10337, 10346-10347.

**2.** The parties cross-moved for summary judgment. PPFA's opposition as to the Legal Representation Theory was based in large part on the attorney-immunity doctrine—i.e., that PPFA cannot be made to stand suit under Texas, Louisiana, or federal law for its attorney-employees' advising third-party clients to seek relief in

federal court, drafting and filing pleadings, briefs, and communications, and otherwise "masterminding and orchestrating" a legal strategy, ROA.10324, 8564-8573, 9180-9188.

The district court rejected that argument for two reasons. First, it held that the "litigation privilege" does not apply because Relator does "not purport to attach personal liability to the individual L&L lawyers' representation of Affiliate Defendants," but rather respondeat superior liability to PPFA. ROA.46682. Second, the court held that the FCA and its analogues override attorney immunity and the litigation privilege: "nothing in Section 3729(a)(1) purports to preclude liability if the person who 'causes' the submission of false claims just so happens to be a lawyer." *Id.* The court separately green-lighted Relator's Control Theory, holding that PPFA could be directly liable based on "evidence of a policy, practice, or 'ongoing business relationship' that indirectly caused Affiliate Defendants to submit false claims." ROA.46680-46681 (citation omitted).

The district court did, however, grant PPFA summary judgment on Relator's reverse-false-claims claim on statutory grounds. ROA.46677-46678.

**3.** PPFA appealed the Legal Representation Theory portion of the district court's order under the collateral-order doctrine. *See, e.g.*, *Troice*, 816 F.3d at 348; *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 992 (5th Cir. 1999); ROA.12000. PPFA also moved the district court to stay proceedings in light of its appeal. ROA.12004.

Relator opposed the stay and asked the district court to certify PPFA's appeal as frivolous. ROA.12056, 12154. The district court rejected Relator's request and granted the stay, ROA.48279, holding that its "rejection of any 'litigation privilege' or 'attorney immunity' concerning PPFA's L&L department is an immediately appealable collateral order," ROA.48281. The court further noted that Relator's argument "that attorney immunity does not apply here because PPFA's attorney-employees are not being sued personally"—an argument the district court had earlier adopted in its summary-judgment order—is "unsupported by case law." ROA.48282.

Relator moved to dismiss the appeal for lack of jurisdiction, and the Court carried that motion with the case. Dkt. 39; Dkt. 55-1.

**4.** On February 26, 2025, a panel of this Court reversed the district court. Dkt. 120-1. The panel first held that this Court has appellate jurisdiction under the collateral-order doctrine because PPFA had made a substantial claim of immunity to suit under federal, Texas, and Louisiana law. *Id.* at 6-8. The panel next held that PPFA's attorney-employees would be entitled to attorney immunity for the conduct underlying Relator's Legal Representation Theory under federal, Texas, and Louisiana law. *Id.* at 12-20. Lastly, the panel held that PPFA could not stand trial for this conduct because "federal, Texas, and Louisiana law do not permit respondeat superior liability where the underlying employee is immune," *id.* at 21, and because

16

neither the FCA, the TMFPA, nor the LMAPIL override attorney immunity, *id.* at 21-23.  The Court entered judgment on February 26.  Dkt. 121.

**5.**  On June 26, the Court granted rehearing en banc and vacated the panel opinion.  Dkt. 142, 144.

## SUMMARY OF ARGUMENT

**I.A.**  Relator's claims against PPFA are barred insofar as they rely on legal advice, strategy, and representation L&L provided to the Affiliate Defendants.

**1.a.**  Texas absolutely immunizes attorneys from civil liability to non-clients for actions taken in connection with representing a client in litigation.  Filing lawsuits and providing advice on which the client acted is fully protected.  Only conduct foreign to the duties of a lawyer—such as fraudulent conduct outside the scope of an attorney's legal representation of his client—falls outside the bounds of the immunity.

**b.**  Texas attorney immunity clearly covers the L&L conduct that is alleged to have violated the TMFPA: advising the Affiliate Defendants to (successfully) seek a federal injunction against their terminations from Medicaid; aiding Affiliate Defendants in (successfully) seeking a "grace period" from Texas once this Court vacated the Texas injunction; and assisting the Affiliate Defendants in filing an (ultimately unsuccessful) mandamus petition in Texas state court.  None of this conduct can plausibly be described as foreign to the duties of a lawyer.

**2.** Relator's LMAPIL claims based on L&L's alleged conduct are likewise barred.

**a.** Louisiana recognizes a similar attorney-immunity doctrine; the only difference is that immunity does not apply when the attorney is shown to have acted with specific malice or intent to harm. Filing a lawsuit—even (unlike here) a meritless one—does not satisfy the specific-malice requirement.

**b.** L&L's representation of PPGC in successfully seeking a Louisiana federal-court injunction is obviously protected. So too is L&L's representation of PPGC in opposing vacatur of that injunction after this Court vacated the Texas injunction (especially since the Louisiana district court *agreed* with PPGC, and Louisiana never went through with the threatened termination).

**3.** Supreme Court precedent, common-law history, and basic principles underlying our legal system confirm a similar attorney-immunity doctrine under federal law. The L&L conduct alleged to have violated the FCA is the same conduct described above, and is immune from suit under federal law for the same basic reasons.

**B.** The district court did not disagree with any of the above, but held that these immunities did not apply to PPFA because (i) Relator sued PPFA rather than L&L attorneys, and (ii) the FCA and its state analogues apply to "any person" who

18

"causes" the making of false claims, without excluding attorneys.  Neither ground overcomes the attorney-immunity bar.

**1.**  A plaintiff cannot circumvent attorney immunity by suing the attorneys' employer rather than suing the attorneys directly.  If a primary actor is immune from suit, then a defendant sued on a respondeat superior theory is immune, too.  That is why (as all agree) law firms are protected by attorney immunity for the conduct of their attorneys.  And it is why courts have applied the same rule to various other immunities, such as sovereign and official immunity.  What matters for attorney immunity is not the identity of the defendant but the allegedly unlawful *conduct*— the doctrine is intended to ensure that attorneys are not deterred from zealous advocacy, and that purpose would be undermined completely if an attorney's employer (whether a law firm or a corporation or a non-profit) could be sued by a non-client for the attorney's conduct.

**2.**  The district court's unexplained assertion that the statutes apply to attorney representation and litigation conduct that "causes" the filing of a false claim is also wrong.  For one thing, an attorney providing legal representation does not "cause" a client to do anything—it is always the client's decision whether to act on attorney advice—so the district court's conclusion fails at the threshold.  Regardless, the statutes do not override attorney immunity for at least two fundamental reasons.

**a.** Federal, Texas, and Louisiana courts all decline to read statutes to override common-law defenses absent clear legislative intent to do so. The FCA and its analogues do not evidence such intent, so the immunities described above fully apply to claims under those statutes.

**b.** General principles of statutory interpretation and constitutional avoidance preclude reading the statutes to encompass attorney representation, especially with respect to litigation and other activity that falls within the First Amendment's Petition Clause. Courts have repeatedly and in various contexts construed statutes not to apply to pursuing litigation and other ways of petitioning the government absent clear statutory language reaching such conduct. The FCA and its analogues lack such language and thus do not apply to L&L's conduct at all, let alone override immunities protecting that conduct from suit.

**II.** This Court has appellate jurisdiction.

**A.** This Court has long held that a denial of attorney immunity under Texas law is an immediately appealable collateral order because that doctrine provides an immunity from suit and not just liability. *Troice*, 816 F.3d at 348. There is no basis to disturb that holding, which the Court has repeatedly reaffirmed.

**B.1.** The Court has appellate jurisdiction over denials of Louisiana and federal attorney immunity for the same reasons: those doctrines likewise provide an immunity from suit rather than merely a defense to liability.

20

**2.**   In the alternative, this Court may exercise pendent jurisdiction as to Louisiana and federal immunity because its resolution of the immunity question under Texas law (over which it undoubtedly has jurisdiction) will resolve the Louisiana and federal immunity questions as well.

**C.**   The Court is not deprived of appellate jurisdiction merely because some of Relator's claims are not subject to attorney immunity.  The Supreme Court and this Court have repeatedly held that appellate jurisdiction exists over denials of immunities, even when those immunities apply to some but not all claims.

## STANDARDS OF REVIEW

This Court reviews de novo a district court's denial of an immunity defense as well as its interpretation of state law.  *Troice*, 816 F.3d at 345.

## ARGUMENT

To the degree Relator's claims are predicated on his Legal Representation Theory, they are barred by the attorney-immunity doctrine.   And Relator's contention that this Court lacks jurisdiction to consider the district court's denial of summary judgment based on this doctrine is refuted by this Court's established precedent.  *See Troice*, 816 F.3d at 348.

I.    **RELATOR'S CLAIMS ARE BARRED TO THE DEGREE THEY ARE BASED ON HIS LEGAL REPRESENTATION THEORY.**

   A.    **L&L's Conduct Is Not Actionable Under Texas, Louisiana, Or Federal Law.**

      1.    **Texas Law**

   **a.**   Texas law immunizes attorneys from civil liability to non-clients "for actions taken in connection with representing a client in litigation." *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015) (citation omitted) (collecting cases). "[A]n attorney may be liable to nonclients only for conduct outside the scope of his representation of his client or for conduct foreign to the duties of a lawyer." *Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018); *see also Cantey Hanger*, 467 S.W.3d at 484 (only "fraudulent conduct that is outside the scope of an attorney's legal representation of his client" is actionable). Attorney conduct is "not actionable if it is 'part of the discharge of the lawyer's duties in representing his or her client.'" *Cantey Hanger*, 467 S.W.3d at 481 (quoting *Toles v. Toles*, 113 S.W.3d 899, 910-11 (Tex. App. 2003)).

   The "attorney-immunity defense is intended to ensure 'loyal, faithful, and aggressive representation by attorneys employed as advocates.'" *Id.* (citation omitted). It ensures that lawyers are "able to pursue legal rights they deem necessary and proper for their clients without the menace of civil liability looming over them and influencing their actions." *Taylor v. Tolbert*, 644 S.W.3d 637, 647 (Tex. 2022). By "protecting" attorneys "not only against liability but also against incurring the

costs of defending a lawsuit," attorney immunity furthers "the effective functioning of our adversary system." *Troice*, 816 F.3d at 346.

"[T]he filing of lawsuits and pleadings" and "the providing of legal advice upon which [a] client acted" are undoubtedly protected conduct. *Alpert v. Crain, Caton & James P.C.*, 178 S.W.3d 398, 408 (Tex. App. 2005); *see also Taylor*, 644 S.W.3d at 649 ("filing pleadings" and "obtaining court orders … are the kinds of actions that lawyers undertake in representing a client").

**b.**  As the panel opinion recognized, Relator's TMFPA claims against PPFA "undoubtedly relate to L&L's representation of the Affiliate Defendants in their efforts to retain their Medicaid status in Texas" and "can properly be categorized as litigation strategy." Dkt. 120-1 at 19.  These claims rely on three different categories of legal advice or advocacy that L&L provided as part of its representation of the Affiliate Defendants in contesting the Texas termination.[5]

First, L&L is accused of "steer[ing]" Affiliate Defendants away from the state administrative process and instead (successfully) seeking an injunction in federal court.[6]  ROA.10326.  This is the heart of Relator's Legal Representation Theory— the idea that L&L (and, by proxy, PPFA) masterminded a fraud by advising its

---

[5] Relator's allegations regarding L&L's representation of PPGC in contesting the Louisiana termination are addressed in the LMAPIL section below.

[6] Any specific advice L&L attorneys gave the Affiliate Defendants was of course privileged.

clients to seek relief in federal court. But advising a client regarding what relief to seek and in what forum is one of the most basic ways a lawyer "discharge[s his or her] duties in representing his or her client." *Cantey Hanger*, 467 S.W.3d at 481 (quoting *Toles*, 113 S.W.3d at 910-11); *see also Alpert*, 178 S.W.3d at 408.

Second, L&L purportedly aided Affiliate Defendants in requesting a "grace period" from Texas (which the state granted) to continue participating in Medicaid for an additional month after the Texas injunction was vacated. ROA.10326-10327. Advising clients regarding communications with regulators and other state actors is a standard form of legal representation. *See Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 51 (Tex. 2021) (intent-to-sue letter delivered to adversary as well as various government officials was "the product of lawyerly work for a client involving 'the office, professional training, skill, and authority of an attorney'" (quoting *Cantey Hanger*, 467 S.W.3d at 482)); *Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 79 (Tex. 2021) ("Zealous representation must occur not just in litigation, but in 'all professional functions' of an attorney." (citation omitted)).

Third, L&L is accused of "assist[ing]" Affiliate Defendants in filing a mandamus petition in Texas state court at the end of the grace period. ROA.10326-10327. That effort eventually failed, but advising Affiliate Defendants about an "unsuccessful" or even purportedly "meritless" lawsuit (ROA.10333-10334) does not constitute conduct "foreign to the duties of an attorney." *Cantey Hanger*, 467

S.W.3d at 483.  As discussed above, legal advice regarding remedies and fora are core attorney conduct, regardless of whether the advice ultimately achieves the client's objective.  *See* Restatement (Third) of the Law Governing Lawyers § 94 (2000); *Taylor*, 644 S.W.3d at 646-47.  And while even frivolous lawsuits are protected, *Alpert*, 178 S.W.3d at 402, 407-08 (affirming dismissal of claims against law firm based partly on firm's filing of "frivolous lawsuits"), the lawsuit here was far from frivolous—the Travis County judge initially granted a temporary restraining order, *In re: Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc.*, No. D-1-GN-21-000528 (Travis Cnty. Dist. Ct. Feb. 3, 2021), and went out of her way to note that her later decision denying mandamus was "not made lightly" and that "[t]he facts underlying the termination in this case g[a]ve [her] great pause," ROA.24704-24705.  That is presumably why the State never sought sanctions or otherwise alleged that the lawsuit was frivolous.

Thus, Relator's TMFPA claims against PPFA fail to the degree they are based on the Legal Representation Theory because they "are predicated on alleged litigation strategies, conduct, and legal maneuvering" to purportedly "'cause' the submission of allegedly false claims and to conspire to violate both federal and state law."  ROA.48284.

### 2. Louisiana Law

**a.** Louisiana embraces the "traditional, majority view that an attorney does not owe a legal duty to his client's adversary when acting in his client's behalf." *Montalvo v. Sondes*, 637 So.2d 127, 130 (La. 1994). For this reason, "an attorney acting on behalf of his client may not be sued by an adversary based on negligence or malpractice." *Id.* This rule furthers "[a]n attorney's duty … to zealously represent his client." *Penalber v. Blount*, 550 So.2d 577, 581 (La. 1989). Attorneys may, however, be sued for intentional torts. *Montalvo*, 637 So.2d at 130. To "prevent a chilling effect on the adversarial practice of law" and "a division of loyalty owed to a client," this liability requires a showing of "specific malice or an intent to harm on the part of the attorney in persuading his client to initiate and continue the suit." *Id.*

Louisiana courts recognize that "identifying an intentional tort in the context of an attorney's actions may be more difficult than identifying a traditional intentional tort." *Id.* But "[i]t is clear that the mere filing of a lawsuit, even if the suit appears meritless on its face, is not enough." *Id.*; *see also Spencer v. Burglass*, 337 So.2d 596, 599-600 (La. Ct. App. 1976) (allegations that defendant filed frivolous suit and failed to interview witnesses or obtain supporting evidence did not support malice). Neither is making arguments or allegations "that [a]re no longer true in light of [other legal] proceedings," *Montalvo*, 637 So.2d at 131, or making "tactical" representations during settlement negotiations, *Castle v. Castle*, 123 So.3d

1267, 1272 (La. Ct. App. 2013). Because an attorney "is simply 'the instrument through which the client' seeks to secure his rights," a third-party plaintiff seeking to hold an attorney liable for client representation must "demonstrate that the defendant-attorney had 'a desire to harm which is independent of the desire to protect [her] client.'" *Congress Square Ltd. P'ship v. Polk*, 2011 WL 837144, at *11 (E.D. La. Mar. 4, 2011) (citations omitted) (alteration in original); *see also Schmidt v. Cal-Dive Int'l, Inc.*, 240 F. Supp. 3d 532, 547 (W.D. La. 2017) (no malice where plaintiff cannot show that attorney acted "outside of [her] role as [her client's] attorney[]").

**b.** As the panel opinion recognized, Relator has made "no allegations of specific malice or an intentional tort on behalf of the L&L attorneys," Dkt. 120-1 at 10, either at summary judgment or on appeal. To the contrary, the conduct that Relator says violated the LMAPIL is protected on its face. Relator faults L&L for advising PPGC to move to enjoin the termination in federal district court rather than pursuing the state administrative process. ROA.10327. But "the mere filing of a lawsuit" cannot constitute an intentional tort. *See Montalvo*, 637 So.2d at 130. That is especially so when the lawsuit was successful, and was affirmed by a panel of this Court. *See supra* at 10-11.

Relator says L&L also allegedly violated the LMAPIL by representing PPGC in opposing LDH's motion to vacate the Louisiana preliminary injunction following this Court's en banc decision in *Kauffman*. ROA.10335. That,

obviously, does not constitute specific malice—the Louisiana district court *agreed* with PPGC and declined to vacate the preliminary injunction, and Louisiana subsequently settled the case and allowed PPGC to remain a Louisiana Medicaid provider. *See supra* at 11-12.

### 3.     Federal Law

Relator's FCA claim against PPFA is based on exactly the same conduct that he says violates the TMFPA and LMAPIL. *See* ROA.10324-10336, 48283-48284. At summary judgment, PPFA argued that the same immunity defense that applies under state law also applies under federal law. ROA.8564-8570. Relator has not attempted to counter this argument on the merits, either at summary judgment or before the panel, and for good reason—such immunity has a long pedigree dating to well before the FCA's enactment, as the panel correctly concluded. Dkt. 120-1 at 14-18.

When assessing categories of common-law immunity, the Supreme Court conducts "a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Imbler v. Pachtman*, 424 U.S. 409, 421 (1976). This "functional approach" involves "identify[ing] those governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed to ensure that they are performed 'with independence and

without fear of consequences.'"  *Rehberg v. Paulk*, 566 U.S. 356, 363 (2012) (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)).

The judicial process is a prime example.  *See Butz v. Economou*, 438 U.S. 478, 512 (1978) (discussing "[t]he cluster of immunities protecting the various participants in judge-supervised trials").  The Supreme Court has thus recognized "absolute immunity from subsequent damages liability for all persons—governmental *or otherwise*—who were integral parts of the judicial process." *Briscoe v. LaHue*, 460 U.S. 325, 335 (1983) (emphasis added).  This immunity extends not only to judges and prosecutors but to private individuals who play an "indispensable" role in that process.  *Id.* at 345-46; *see also Forrester v. White*, 484 U.S. 219, 229 (1988) (immunity turns on "the nature of the function performed, not the identity of the actor who performed it").

As early as 1879, the Supreme Court recognized that third parties may not sue attorneys for tortious client representation—in that case, malpractice—explaining that "[t]here would be no bounds to actions and litigious intricacies" if third parties were able to attack an attorney's client representation.  *Nat'l Sav. Bank of D.C. v. Ward*, 100 U.S. 195, 202 (1879).  The Supreme Court has repeatedly and more recently recognized that attorney immunity existed at common law.  *See Butz*, 438 U.S. at 512 ("Absolute immunity is thus necessary to assure that judges, *advocates*, and witnesses can perform their respective functions without harassment or

intimidation"); *Briscoe*, 460 U.S. at 334-35 (explaining that "absolute immunity of public prosecutors … extended equally to other participants, including *counsel* and witnesses"); *Yaselli v. Goff*, 275 U.S. 503 (1927), *aff'g*, 12 F.2d 396, 404 (2d Cir. 1926) (recognizing common-law immunity for "judges, jurors, *attorneys*, and executive officers of the government") (all emphases added).

These principles were long recognized in British common law, which held that in order "to encourage due freedom of speech in the lawful defen[s]e of their clients, … a counsel is not answerable for any matter by him spoken, relative to the cause in hand, and suggested in his client's instructions."  3 William Blackstone, *Commentaries on the Laws of England* (1854) 32.  This immunity was rooted in the principle that "counsel should be protected in the execution of their duty in [c]ourt" and "observations made in the due discharge of that duty should not be deemed actionable." *Hodgson v. Scarlett*, 171 Eng. Rep. 362, 363 (C.P. 1817).  Accordingly, "no action can be maintained for words spoken in judicial proceedings." *Id.*; *see also Rex v. Skinner*, 98 Eng. Rep. 529, 530 (K.B. 1772) ("[N]either party, witness, counsel, jury, or [j]udge, can be put to answer, civilly or criminally, for words spoken in office.").

The same principles are codified in the Restatement, which notes that a "lawyer engaging in litigation on behalf of a client" is protected "from civil actions brought by nonclients."  Restatement (Third) of the Law Governing Lawyers § 57

(2000) cmt. b; *see also id.* § 56 ("[a] lawyer, like other agents, is not as such liable for acts of a client that make the client liable"); ROA.8565.  They are also recognized by state courts across the country, which read the Supreme Court's decision in *Briscoe* as establishing that "the litigation privilege at common law protect[s] *all* participants in the court system, and private attorneys [are] treated no differently from judges, government lawyers and witnesses." *Simms v. Seaman*, 308 Conn. 523, 555 (2013); *see also, e.g.*, *Loigman v. Twp. Comm. of Twp. of Middletown*, 185 N.J. 566, 583 (2006) (same); *Hamed v. Pfeifer*, 647 N.E.2d 669, 672 (Ind. Ct. App. 1995) (same).  In fact, nearly all American states have adopted "absolute immunity for lawyers involved in litigation."[7]  The "common thread found throughout [the states] is the idea that an attorney acting within the law, in a legitimate effort to zealously advance the interests of his client, shall be protected from civil claims arising due to that zealous representation." *Taylor v. McNichols*, 149 Idaho 826, 840-41 (2010).

It would be anomalous for an immunity whose long pedigree has been acknowledged by the Supreme Court to apply throughout the nation in state courts but not under federal law.  And the negative consequences of rejecting such a rule would be severe.  As the panel opinion recognized, "[i]f private attorneys did not have immunity for their activities within the scope of litigation, they would be

---

[7] T. Leigh Anenson, *Absolute Immunity from Civil Liability: Lessons for Litigation Lawyers*, 31 Pepp. L. Rev. 915, 917 (2004).

subject to suit from a third party every time they represent an unpopular client or advance an unpopular issue," creating a "chilling effect … on private attorneys' willingness to participate in unpopular cases." Dkt. 120-1 at 17. The panel also noted that "allowing third parties to sue private attorneys has the potential to interfere with the attorney's relationship with their own client" because attorneys "would be incentivized to consider their own legal exposure" over their clients' best interests. *Id.*

This federal immunity does not mean that private attorneys are immune from liability for egregious intentional conduct. The Supreme Court has held, for example, that a defense attorney is not immune from Section 1983 liability for conspiring with the prosecutor and judge to convict his client. *See Tower v. Glover*, 467 U.S. 914, 923 (1984). The federal rule may thus be more like Louisiana's than Texas's. *See supra* Part I.A.2. Moreover, as the panel recognized, other "safeguards built into the judicial process police the conduct of private attorneys," such as adversarial dispute, judicial sanctions, bar discipline, and "malpractice suits from their own clients and loss of business if they act unethically when performing advocacy functions." Dkt. 120-1 at 17; *see also Butz*, 438 U.S. at 512 ("Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court."); Restatement, *supra*, § 57 cmt. b ("the adversary system itself provides some control against

improper lawyer conduct in litigation, as does the tribunal's power to govern the conduct of lawyers appearing before it and the availability of professional discipline" (internal citations omitted)).  But there is no basis to reject the basic rule, long recognized at common law, that attorneys may not be sued by third parties merely for representing their clients.

### B.    The District Court's Grounds For Rejecting PPFA's Defenses Are Incorrect And Should Be Rejected.

The district court's decision did not contradict or disagree with any of the above.  Rather, the district court rejected attorney immunity because (i) Relator does "not purport to attach personal liability to the individual L&L lawyers[]," ROA.46682, and (ii) the FCA and its state analogues override any attorney-immunity defenses:  "nothing in Section 3729(a)(1) purports to preclude liability if the person who 'causes' the submission of false claims just so happens to be a lawyer."  *Id.*  As the panel opinion rightly held, both bases for rejecting PPFA's immunity defense are incorrect.

### 1.    Relator Cannot Evade Attorney Immunity By Suing The Attorneys' Employer On A Respondeat Superior Theory.

As the panel opinion correctly recognized, Dkt. 120-1 at 20-21, a plaintiff cannot artfully plead around the fundamental immunities described above by suing an attorney's employer instead of the attorney herself.

It is well established that a "principal's vicarious liability turns on whether the

agent is liable." Restatement (Third) of Agency § 7.03 (2006); *see also Johnson v. Sawyer*, 47 F.3d 716, 730 (5th Cir. 1995) ("*Respondeat superior* does not impose liability on the employer *unless* the employee's conduct has been actionable." (emphasis in original)). Thus, the "ordinary rule" is that "if the party who actually causes the injury is free from all civil and criminal liability therefor, his employer must also be entitled to a *like immunity*." *New Orleans & N.E.R. Co. v. Jopes*, 142 U.S. 18, 24 (1891) (emphasis added); *see also Cameron Compress Co. v. Kubecka*, 283 S.W. 285, 287 (Tex. Civ. App. 1926) (describing "like immunity" as rule that "the act of the servant [is] the act of the master, and that which excuses or justifies the one will in like manner excuse and justify the other"); *Roe v. Patterson*, 2023 WL 2787956, at *8 (E.D. Tex. Apr. 4, 2023) ("'like immunity' operates as a corollary of the familiar rule of respondeat superior" (quoting *Cameron Compress*, 283 S.W. at 287)); *Nat'l Mfg. Co. v. United States*, 210 F.2d 263, 278 (8th Cir. 1954) (in context of Federal Tort Claims Act, which "'merely subjects the Government to the same liability as the delinquent employee in accordance with the local law … government liability derives from the doctrine of respondeat superior and 'where the employee is immune the employer is entitled to a like immunity'"").

For example, the Texas Supreme Court has held that a state employer cannot be liable under the Texas Tort Claims Act for its employee's conduct when that employee is entitled to official immunity. *DeWitt v. Harris County*, 904 S.W.2d

650, 654 (Tex. 1995). In analyzing this question, the court looked to whether a governmental unit would be liable "according to Texas law" "were it a private person" and held that a private employer defending against a respondeat superior theory is "entitled to assert any affirmative defenses its employee has to liability." *Id.* (quoting Tex. Civ. Prac. & Rem. Code § 101.021(2)).

The Louisiana Supreme Court has similarly held that because vicarious liability "imposes liability on employers 'for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed[,]' … [w]here an employee is accorded immunity, necessarily, his employer cannot be held vicariously liable for his actions or inactions." *Jameson v. Montgomery*, 366 So.3d 1210, 1216 n.7 (La. 2023) (quoting La. Civ. Code. Art. 2320); *see also Misita v. Maumoulides*, 336 So.3d 886, 887-88 (La. 2022) (per curiam) (government employer entitled to "discretionary immunity" for employee's immunized conduct); *Brown v. Foti*, 1994 WL 518187, at *3 (E.D. La. Sept. 21, 1994) (dismissing claim against Louisiana for judge's conduct where judge was "absolutely immune from suit").

This Court affirmed the principle of like immunity (although it did not use that term) in *Austin Municipal Securities, Inc. v. National Association of Securities Dealers, Inc.*, 757 F.2d 676, 692 (5th Cir. 1985), where it held that a private disciplinary organization for the securities industry was entitled to the same absolute

immunity as its members. The organization was sued "in its representative capacity, and the claims made against it were the result of actions of [its] members' conduct." *Id.* Like Relator, the plaintiffs had alleged that the organization was complicit "in the conspiracy but ha[d] not suggested how the organization participated beyond the actions of its immune officials." *Id.* Noting that "[i]t would be an[o]malous to refuse to absolutely immunize the parent organization" for its officers' immunized conduct when that conduct "form[s] the sole basis for charges laid against the parent," this Court held that the organization was also immune. *Id.* The Court relied in part on a policy concern that is front and center in this litigation: a parent organization like PPFA is often a "more visible target" for "recriminatory lawsuits" than the individuals who make up its membership or employees. *Id.* at 692; *see also Zandford v. Nat'l Ass'n of Sec. Dealers, Inc.*, 30 F. Supp. 2d 1, 11 (D.D.C. 1998), *aff'd*, 221 F.3d 197 (D.C. Cir. 2000) (per curiam) (citing *Austin* in holding that "pursuant to the principle of *respondeat superior*," an organization "is absolutely immune for the activities for which its staff are absolutely immune").

There is no basis for excluding attorneys from the general rule of like immunity. Even Relator has admitted that attorney immunity covers law firms, Dkt. 86-1 at 38, and the purpose of attorney immunity is equally implicated whether the employer at issue is a law firm or another organization that employs attorneys who represent third parties. *See Troice*, 816 F.3d at 344 n.1 (law firms sued "under

a respondeat superior theory"); *Landry's, Inc. v. Animal Legal Def. Fund*, 566 S.W.3d 41, 61 (Tex. App. 2018) (attorney immunity "extends to the organizations through which attorneys render legal services"), *reversed in part by* 631 S.W.3d 40, 51 n.12 (declining to reach this aspect of lower court's holding).[8]  An attorney will be deterred from complying with her ethical duty to provide "loyal, faithful, and aggressive representation" to her clients, *Cantey Hanger*, 467 S.W.3d at 481 (citation omitted), if she knows that this representation could subject her employer to disruptive litigation and significant damages claims—potentially imperiling her job as well as her employer.  This risk exists regardless of whether the employer is a law firm or a corporation.  That is why attorney immunity does not turn on the identity of the defendant but rather on the attorney *conduct* that is alleged to be unlawful; the point of the doctrine "is to immunize *conduct*."  *Troice*, 816 F.3d at 349 (emphasis added); *see also Cantey Hanger*, 467 S.W.3d at 481 (describing

---

[8] Relator has attempted to characterize *Landry's* as evidence of the Texas Supreme Court's "narrow[]" interpretation of attorney immunity, Dkt. 86-1 at 44, but the Texas Supreme Court did not rule on the issue (unlike the court of appeals, whose ruling—which the Texas Supreme Court left undisturbed—is "the strongest indicator of what [that court] would do," *Kelly v. Nichamoff*, 868 F.3d 371, 374 (5th Cir. 2017) (citation omitted)).  When the Texas Supreme Court has ruled on attorney immunity, it has rejected requests to narrow its scope. *See, e.g.*, *Cantey Hanger*, 467 S.W.3d 477 (declining to adopt fraud exception); *Youngkin*, 546 S.W.3d 675 (declining to adopt settlement-conduct exception); *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 657 (Tex. 2020) (declining to adopt criminal-conduct exception); *Haynes & Boone*, 631 S.W.3d at 78 (declining to limit doctrine to litigation context).

"*conduct*" as "not actionable if it is 'part of the discharge of the lawyer's duties in representing his or her client'" (quoting *Toles*, 113 S.W.3d at 910-11) (emphasis added)).

After all, putting PPFA on trial for L&L attorneys' immunized conduct would force PPFA to "incur[] the costs of defending a lawsuit," *Troice*, 816 F.3d at 346, and face potentially large damages and penalties for its attorney-employees' core advocacy conduct. L&L attorneys would not personally be on the hook for any damages, just as law-firm attorneys would not be if their firm were sued for their client representation. But the fact that PPFA would have to stand trial and possibly be subject to liability for the advice L&L attorneys gave would quite obviously deter those attorneys (and attorneys everywhere) from zealously representing their clients, thereby "imperiling 'a substantial public interest': the effective functioning of our adversary system." *Id.* (quoting *Will v. Hallock*, 546 U.S. 345, 353 (2006)).

Finally, as Relator has admitted, Dkt. 86-1 at 45-46, a holding rejecting attorney immunity in this case could expose numerous organizations and employers to liability based on their attorney-employees' representation of third parties. Many nonprofits and organizations across the political spectrum, in Texas and elsewhere, engage in a range of mission-oriented activities that include providing staff legal representation to members or other third parties. For example, the AARP Foundation offers job training, benefits assistance, and other social services, as well

as "a public interest law firm" that brings impact-oriented lawsuits on behalf of older adults.[9]  The Texas Public Policy Foundation runs various research and policy initiatives, including a center that "launches legal challenges … on behalf of ordinary people whose lives, liberty, and property are threatened by government action in defiance of the Constitution."[10]  The Home School Legal Defense Association provides educational consulting and curricular and financial support to its members, as well as in-house legal representation.[11]  Liberty Counsel provides "cooperative churches" with education, training, missionary resources, and "[l]egal representation specific to our mission to advance religious freedom, the sanctity of human life and the family."[12]  Catholic Charities of Central Texas provides a "holistic set of programs and services to engage, educate, and empower Central Texans out of poverty," including direct legal services.[13]  And Genesis Women's

---

[9]  *Legal Advocacy*, AARP Foundation, https://www.aarp.org/aarp-foundation/our-work/legal-advocacy/?intcmp=FOU-NAV-DO-ADV (last visited July 23, 2025).

[10]  *Center for the American Future*, Texas Public Policy Foundation, https://www.texaspolicy.com/initiatives/center-for-the-american-future (last visited July 23, 2025).

[11]  *What We Do*, Home School Legal Defense Association, https://hslda.org/post/what-we-do (last visited July 23, 2025).

[12]  *Resources and Benefits for Churches*, Liberty Counsel, https://lc.org/Churches (last visited July 23, 2025).

[13]  *About Us*, Catholic Charities of Central Texas, https://ccctx.org/about-us/ (last visited July 23, 2025).

Shelter & Support provides shelter, transitional housing, and counseling as well as direct representation in legal proceedings.[14]

Nor are examples limited to these mission-oriented organizations. Insurers frequently employ "staff attorneys to defend claims against insureds." *Unauthorized Prac. of Law Comm. v. Am. Home Assurance Co.*, 261 S.W.3d 24, 29 (Tex. 2008). And professional associations and unions often offer legal representation by staff attorneys as a membership benefit.[15]

Rejecting attorney immunity in the context of non-law-firm organizations would subject these and similar organizations to suit not only under the FCA but under any cause of action. The point of attorney immunity is to ensure that attorneys can zealously advocate for their clients "without harassment or intimidation," *Butz*, 438 U.S. at 512, and if the AARP Foundation, Liberty Counsel, a union—or PPFA—could be sued for legal advice/representation of third parties by lawyers they employ,

---

[14] *All Genesis Services*, Genesis Women's Shelter & Support, https://www.genesisshelter.org/all-services (last visited July 23, 2025).

[15] *See, e.g.*, Legal Services, Combined Law Enforcement Associations of Texas, https://www.cleat.org/services/legal/ (last visited July 23, 2025) (on-staff legal representation provided by police union); Staff Attorneys & Legal Representation, Texas Classroom Teachers Association, https://www.tcta.org/legal-services/staff-attorneys-legal-representation (last visited July 23, 2025) (same, for teachers' union); *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967) (membership organizations have First Amendment right "to provide legal services for [their] members").

those lawyers would be deterred from providing zealous representation just as much as if a law firm could be sued for its attorneys' advice and representation.[16]

Because subjecting PPFA (and similarly structured organizations) to suit for their attorney-employees' protected legal work on behalf of third-party clients would hobble "the effective functioning of our adversary system," *Troice*, 816 F.3d at 346, the attorney-immunity doctrine applies. The district court's contrary conclusion was erroneous.

### 2. The FCA And Its State Analogues Do Not Override Attorney Immunity And Do Not Apply To The Litigation Conduct Alleged Here.

**a.** The district court also held that the FCA and its analogues do not recognize attorney immunity—they apply to anyone who "causes" the submission of a false claim even if that person "happens to be a lawyer." ROA.46682. That statement is on its face incorrect as applied to Relator's Legal Representation Theory: an attorney providing legal advice does not "cause" her client to do anything. *See*

---

[16] Courts have recognized that the risk of retributive suits in circumstances such as these—where counsel for Relator was also opposing counsel to the Affiliate Defendants in the underlying Texas termination litigation, *Smith*, ECF No. 147 (May 20, 2017)—is especially pernicious. *See Butz*, 438 U.S. at 512 ("The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus."). That is one reason why such suits are barred altogether. *See Butz*, 438 U.S. at 512; *Bradt v. West*, 892 S.W.2d 56, 72 (Tex. App. 1994) ("An attorney should not go into court knowing that he may be sued by the other side's attorney for something he does in the course of representing his client.").

*Williams v. Thaler*, 2013 WL 1249773, at *14 (E.D. Tex. Mar. 26, 2013) ("Once an attorney counsels his client, it is ultimately the client's choice whether to follow that advice."); Restatement (Third) of the Law Governing Lawyers § 56 (2000) ("Proper advice to a client does not constitute assistance leading to liability.").  And even setting that basic point aside, the panel correctly held that "[c]ommon law defenses apply unless explicitly excluded by statute"—and nothing in the FCA or its state analogues abrogate attorney immunity.  Dkt. 120-1 at 21-23.

Under federal, Texas, and Louisiana law, "[s]tatutes which invade the common law" are presumed to retain "long-established and familiar principles, except when a statutory purpose to the contrary is evident."  *United States v. Texas*, 507 U.S. 529, 534 (1993) (citation omitted) (alteration in original); *Troice v. Greenberg Traurig, L.L.P.*, 921 F.3d 501, 507 (5th Cir. 2019) (noting that "[s]tatutes purporting to abrogate common law principles … must do so either expressly or by 'necessary implication'" and holding that Texas Securities Act does not abrogate attorney immunity (quoting *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 428 (Tex. 2017)); *Jameson*, 366 So.3d at 1225 (noting that "those who enact statutory provisions are presumed to act deliberately and with full knowledge of existing laws on the same subject" and holding that Louisiana statute governing discretionary-function immunity did not abrogate prosecutorial immunity (citation omitted)).  Even where a statute applies to "any person," which "would inarguably

42

include attorneys," courts assume that the statute does not abrogate attorney immunity. *Taylor*, 644 S.W.3d at 651-53 (Texas wiretap statute does not apply to attorney's conduct "within the scope of her representation of" her client and "within her attorney function").

Thus, common-law immunities apply even when a statute does not expressly recognize them. The Supreme Court has held, for example, that Section 1983—which "creates a species of tort liability that on its face admits of no immunities," *Imbler*, 424 U.S. at 417—nevertheless adopts common-law immunities because "members of the 42d Congress … likely intended these common-law principles to obtain, absent specific provisions to the contrary." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258 (1981). There is no basis for treating the FCA (which was adopted less than a decade before Section 1983), TMFPA, or LMAPIL differently.

**b.** The foregoing analysis would be true for any common-law defense or immunity. But there is especially good reason to read the FCA and its state analogues not to apply to attorney-representation conduct—particularly when that conduct takes the form of a litigation strategy.[17]

---

[17] The FCA and its state analogues are generally read to have the same scope, ROA.8342, as the district court's analysis—which focuses only on the FCA but applies equally to its analogues, ROA.46682-46683—makes clear. So while this statutory analysis refers to the FCA, the same principles apply to the TMFPA and LMAPIL.

That is because the First Amendment right "to petition the Government for a redress of grievances," U.S. Const. amend. I, "protect[s] an individual's right to file a suit with reasonable basis in a state or federal tribunal." *United States v. Hylton*, 710 F.2d 1106, 1111 n.6 (5th Cir. 1983). Courts are "sensitive to these First Amendment values" when construing federal statutes. *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983).

The *Noerr-Pennington* doctrine is especially salient here. That doctrine originally held that the federal antitrust laws do "not prohibit[] the filing of a lawsuit, regardless of the plaintiff's anticompetitive intent or purpose in doing so, unless the suit was a 'mere sham' filed for harassment purposes." *Id.* at 741 (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972)). The doctrine now applies to federal statutes generally as a "specific application of … the canon of constitutional avoidance"—it is "a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 & n.5 (9th Cir. 2006). The Supreme Court, for example, has invoked this rule when interpreting labor laws to permit the "filing and prosecution of a well-founded lawsuit." *Bill Johnson's*, 461 U.S. at 743; *see also United States v. Reeves*, 752 F.2d 995, 1001 (5th Cir. 1985) (relying on *Bill Johnson's*, 461 U.S. 731, in interpreting federal

criminal statute to avoid a reading that would infringe on "first amendment guarantee of freedom to petition").

Courts invoke these principles when interpreting all kinds of federal statutes. For example, "a multitude of … courts" have held that even "meritless litigation is not extortion under [18 U.S.C.] § 1951." *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003) (listing cases); *see also, e.g.*, *United States v. Pendergraft*, 297 F.3d 1198, 1205-08 (11th Cir. 2002) (threat to sue, even when accompanied by fabricated evidence, is not criminal extortion); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) ("A threat of litigation … does not constitute extortion."). These courts have recognized that the plain text of Section 1951, which prohibits "induc[ing]" another to convey property "by wrongful use of actual or threatened force, violence, or fear," 18 U.S.C. § 1951(b)(2), could apply to litigation that "induce[s] fear in a defendant." *Deck*, 349 F.3d at 1258. But they have also recognized that American law "encourage[s] … resort to courts for the redress of wrongs and the enforcement of rights," restricting litigant sanctions to "only the most frivolous of actions." *Pendergraft*, 297 F.3d at 1206. Because "[a]llowing litigants to be charged with extortion would open yet another collateral way for litigants to attack one another," *id.* at 1207, these courts have read the Hobbs Act to not apply to "mere abusive litigation," *Deck*, 349 F.3d at 1255.

The same reasoning applies to mail and wire fraud.  *See Pendergraft*, 297 F.3d at 1208 (listing cases rejecting notion that "serving litigation documents by mail can constitute mail fraud"); *Auburn Med. Ctr., Inc. v. Andrus*, 9 F. Supp. 2d 1291, 1296-97 (M.D. Ala. 1998) (allegations that defendant brought meritless lawsuit and appeals did "not constitute mail fraud for purposes of supporting a RICO claim" but were rather "artfully pleaded claims for malicious prosecution").  Courts read these statutes to not reach court filings, *see id.*, or attorney communications on behalf of a client, *Spiegel v. Cont'l Ill. Nat'l Bank*, 609 F. Supp. 1083, 1089 (N.D. Ill. 1985), *aff'd*, 790 F.2d 638 (7th Cir. 1986) ("Congress could not have intended that the mail fraud statute sweep up correspondence between attorneys, dealing at arm's length on behalf of their parties, concerning an issue in pending litigation" because this "would chill an attorney's efforts and duty to represent his or her client in the course of pending litigation."); *Paul S. Mullin & Assocs., Inc. v. Bassett*, 632 F. Supp. 532, 540 (D. Del. 1986) ("The Court finds absurd plaintiffs' apparent suggestion that a lawyer's act in posting a letter which states a client's legal position in a dispute can constitute mail fraud.").

This rule of construction would, of course, not apply if a statute "indicate[d a] clear intent to reach the [conduct] in question." *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 535 (2002); *accord Sosa*, 437 F.3d at 931.  But nothing in the statutes here indicates such an intent.  There is thus sound reason to reject the district court's

conclusion that the FCA and its state analogues override the preexisting attorney-immunity doctrine.

**c.**  Relator has contended that recognizing attorney immunity in this context would "blow[] a hole in" the FCA and its state analogues because it would mean that if "PPFA's in-house attorneys participated in some unlawful acts alleged here, PPFA, their corporate employer, is immune from liability." Dkt. 128 at 19. Thus, Relator has argued, "corporate defendants will adopt the PPFA playbook and use in-house counsel to supervise subsidiaries' claims process[es] to maximize revenue without fear of liability," which "could cause the government to lose billions in recovered public funds." *Id.*

That contention misunderstands the scope of attorney immunity. That immunity means that lawyers cannot violate the FCA by representing their clients in litigation and related activities, including "masterminding and orchestrating" a legal strategy to seek (and defend in this Court) district-court injunctions. ROA.10324. It does *not* mean that if a corporation involves an attorney in the filing of a false claim, the corporation is somehow immune, and it does *not* mean that companies could "use in-house counsel to supervise subsidiaries' claims process to maximize revenue without fear of liability." Dkt. 128 at 19. To the contrary, while a corporation cannot be indirectly liable *for legal advice provided by one of its attorneys*, that would not shield the corporation from direct liability *for filing a false*

*claim*.  The same goes for non-in-house attorneys.  If attorney representation of a client "causes" the client to make a false claim, the client can be directly liable for making the false claim even if the attorney cannot be liable for the representation. In both situations, the corporation would not be vicariously liable for its attorneys' advice, but directly liable for filing a false claim.  That is why the Affiliate Defendants did not raise an attorney-immunity defense in this case—Relator's claims against the Affiliate Defendants fail for many reasons, but attorney immunity is not one of them.

Thus, while the immunity described here is crucial to preserving attorneys' ability to zealously advocate for their clients, applying the doctrine in this case will have very little impact on the FCA more generally.  Relator's theory, on the other hand, could open the floodgates to FCA suits against attorneys and law firms that no litigant in the statute's more-than-160-year history has, as far as PPFA is aware, attempted to press.

## II.    THIS COURT HAS APPELLATE JURISDICTION OVER PPFA'S APPEAL.

To the extent Relator challenges this Court's jurisdiction to consider this appeal, that contention should be rejected.

**A.** **This Court Has Long Held That The Denial Of Attorney Immunity Under Texas Law Is An Immediately Appealable Collateral Order.**

**1.** "The collateral order doctrine permits appeals from orders that are deemed final under 28 U.S.C. § 1291 because they '(1) conclusively determine the disputed question; (2) resolve an issue that is completely separate from the merits of the action; and (3) would be effectively unreviewable on appeal from a final judgment.'" *Troice*, 816 F.3d at 345 (quoting *Walker v. U.S. Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 766 (5th Cir. 1996)). An order denying immunity is both conclusive and separate from the merits of a case. *Mi Familia Vota v. Ogg*, 105 F.4th 313, 320 (5th Cir. 2024) ("Even if the denial is of immunity from only one claim, there still is a definitive ruling."); *see id.* ("Evaluating whether there is immunity from suit or a claim in no manner determines the merits of asserted claims, only whether they are assertable."). Whether an order denying immunity is effectively unreviewable on appeal from a final judgment turns on whether the immunity "provides a true immunity from suit and not a simple defense to liability." *Troice*, 816 F.3d at 345 (quoting *Sorey v. Kellett*, 849 F.2d 960, 962 (5th Cir. 1988)).

**2.** Applying these principles, this Court has long held (and Relator has not disputed) that denial of attorney immunity under Texas law is an immediately appealable collateral order, *Troice*, 816 F.3d at 348, because "attorney immunity is properly characterized as a true immunity from suit, not as a defense to liability," *id.*

at 346. That is because "the policies underlying attorney immunity support the conclusion that Texas courts seek to protect attorneys against even defending a lawsuit." *Id.* at 348. Attorney immunity ensures "loyal, faithful, and aggressive representation by attorneys employed as advocates" and "is necessary 'to avoid the inevitable conflict that would arise if [an attorney] were forced constantly to balance his own potential exposure against his client's best interest.'" *Id.* at 346 (citation omitted) (alteration in original). The Court recognized that this purpose was "similar to the purposes animating other immunities that Texas has recognized as providing true immunity," such as judicial immunity, prosecutorial immunity, and the litigation privilege. *Id.* All these immunities "share an objective of safeguarding the unfettered exercise of judgment in the judicial system by protecting the person exercising it not only against liability but also against incurring the costs of defending a lawsuit." *Id.* "All therefore protect against imperiling 'a substantial public interest,'" as required by the Supreme Court in *Will*, 546 U.S. at 353: "the effective functioning of our adversary system.*" Troice*, 816 F.3d at 346 (quoting *Will*, 546 U.S. at 353).

This Court has repeatedly affirmed *Troice*'s holding, *see Kelly v. Nichamoff*, 868 F.3d 371, 373-74 (5th Cir. 2017); *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019), and there is no basis to reconsider that holding now.

**B.** **The Court Likewise Has Jurisdiction To Consider PPFA's Appeal As To Louisiana And Federal Immunity.**

**1.** **Denials Of Attorney Immunity Under Louisiana And Federal Law Are Immediately Appealable Under *Troice*.**

While this Court has not considered whether a denial of attorney immunity under Louisiana or federal law is an immediately appealable collateral order, *Troice* answers that question. Both doctrines "provide[] a true immunity from suit and not a simple defense to liability," *Troice*, 816 F.3d at 345 (citation omitted), and serve "'a substantial public interest': the effective functioning of our adversary system," *id.* at 346 (quoting *Will*, 546 U.S. at 353).

As with Texas's attorney-immunity doctrine, Louisiana's immunity is intended to further "[a]n attorney's duty … to zealously represent his client," *Penalber*, 550 So.2d at 581, and "prevent a chilling effect on the adversarial practice of law" and "a division of loyalty owed to a client," *Montalvo*, 637 So.2d at 130. The Louisiana Supreme Court has itself described this doctrine not only as a defense against ultimate liability but as an immunity from suit: "an attorney acting on behalf of his client *may not be sued* by an adversary based on negligence or malpractice." *Id.* (emphasis added).

Attorney immunity under federal common law furthers the same policies. *See supra* I.A.3. Common-law immunity is rooted in the principle that "counsel should be protected in the execution of their duty in [c]ourt" and "observations made in the

due discharge of that duty should not be deemed actionable." *Hodgson*, 171 Eng. Rep. at 363. As the Restatement explains, "[a]llowing nonclients to recover" from an attorney based on her representation of a client "could discourage lawyers from representing clients with proper vigor and thus impede the access of litigants to court." Restatement (Third) of the Law Governing Lawyers § 57 (2000) cmt. b. And a mere defense against ultimate liability would not suffice to further these purposes because the prospect of suit itself would chill attorney representation; an "[a]bsolute immunity is … necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation." *Butz*, 438 U.S. at 512; *see also* Restatement (Third) of the Law Governing Lawyers § 57 (2000) cmt. b ("a lawyer engaging in litigation on behalf of a client" is "protect[ed] … *from civil actions* brought by nonclients"); *see also Hodgson*, 171 Eng. Rep. at 363 ("*no action can be maintained* for words spoken in judicial proceedings"); *Skinner*, 98 Eng. Rep. at 530 ("[N]either party, witness, counsel, jury, or [j]udge, can be *put to answer*, civilly or criminally, for words spoken in office."); *Taylor*, 149 Idaho at 841 ("courts have come to a general agreement that the litigation privilege protects attorneys from *all civil suits* which are raised against them by a party adverse to their clients, as a result of their representation of their clients, provided attorneys do not act beyond the scope of that representation for their own purposes") (all emphases added).

For these reasons, the appealability of the district court's ruling on the Louisiana and federal claims should rise and fall with its ruling on the Texas claims. *Cf. Austin Mun. Sec.*, 757 F.2d at 685 (exercising collateral-order jurisdiction over denial of immunity for private disciplinary organization and its members).

### 2. In The Alternative, The Court Has Pendent Jurisdiction Over Relator's LMAPIL And FCA Claims.

Even if the Louisiana and federal attorney-immunity defenses were not immunities from suit, the Court still would have pendent appellate jurisdiction to consider them. The Court has such jurisdiction over an otherwise non-appealable aspect of an interlocutory order if that aspect is "inextricably intertwined" with the interlocutory order or if "review of the former decision [is] necessary to ensure meaningful review of the latter." *Escobar v. Montee*, 895 F.3d 387, 392 (5th Cir. 2018) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995)). These criteria may be met where "the court will decide some issue in the properly brought interlocutory appeal that necessarily disposes of the pendent claim" or where "the claims involve precisely the same facts and elements." *Id.* at 392-93. Both are true here.

There are some edge-case distinctions between the three immunity doctrines at issue, but as explained above, none makes any difference here. Relator's LMAPIL and FCA claims "revolve around an identical set of facts and have nearly identical elements" to the clearly appealable TMFPA claims. *Batiste v. Theriot*, 458 F. App'x

351, 359-60 (5th Cir. 2012). Thus, if the Court rules for PPFA on the Texas attorney-immunity doctrine, it will "necessarily dispose" of the Louisiana and federal attorney-immunity defenses as well, *Escobar*, 895 F.3d at 393: there would be no basis for this Court to conclude that Texas attorney immunity applies but Louisiana or federal immunity—pertaining to claims based on the exact same allegations—does not.

This Court regularly exercises pendent jurisdiction over "claims that are closely related to" immediately appealable denials of qualified immunity, as declining to do so "would defeat the principal purpose of allowing an appeal of immunity issues before a government employee is forced to go to trial." *Morin v. Caire*, 77 F.3d 116, 119-20 (5th Cir. 1996). The same logic applies to claims of attorney immunity under Louisiana and federal law, which are "closely related to" immediately appealable claims of immunity under Texas law. Even if there were no appellate jurisdiction to consider those immunity appeals standing alone, there is certainly jurisdiction to consider PPFA's Louisiana- and federal-law appeals pendent to its Texas appeal.

### C. The Fact That Some Of Relator's Claims Are Not Subject To Attorney Immunity Does Not Deprive This Court Of Appellate Jurisdiction.

As explained earlier, the attorney-immunity doctrine that is the subject of this appeal precludes Relator's claims based on his Legal Representation Theory, but

does not implicate his Control Theory. *See supra* at 6, 15. Relator has previously argued that the fact that this appeal would not preclude all his claims against PPFA deprives this Court of jurisdiction. That is wrong—as the panel correctly held, a defendant need not "claim[] immunity from every claim asserted against them in the lawsuit" to obtain appellate review of an interlocutory order denying immunity. Dkt. 120-1 at 7.

That is what the Supreme Court held in *Behrens v. Pelletier*, 516 U.S. 299 (1996). Only some but not all claims in that case implicated the defendant's qualified immunity, and the plaintiff argued that the defendant had no right to appeal a denial of qualified immunity because other claims would remain no matter what. *Id.* at 311. The Supreme Court squarely rejected that argument, holding that defendants have qualified immunity from "certain claims, not from litigation in general; when immunity with respect to those claims has been finally denied, appeal must be available, and cannot be foreclosed by the mere addition of other claims to the suit." *Id.* at 312 (emphasis omitted).

This Court has routinely applied that principle to other immunities. For example, the Court recently analyzed this issue in the context of sovereign immunity, holding that it had collateral-order jurisdiction to review a denial of sovereign immunity on constitutional claims even though the defendant would still face trial on statutory claims. *Mi Familia Vota*, 105 F.4th at 320-25. And as *Mi Famila Vota*

noted, *id.* at 322, the Court has reached a similar conclusion in the context of Texas's litigation privilege, exercising jurisdiction over denial of that privilege even though it only applied to one of multiple claims in the suit, *BancPass, Inc. v. Highway Toll Admin., L.L.C.*, 863 F.3d 391, 397-98 (5th Cir. 2017).

The same result is required here. A denial of attorney immunity is immediately appealable, *see supra* II.A, so this Court has jurisdiction over PPFA's attorney-immunity appeal even though that appeal affects Relator's claims only to the degree they are based on his Legal Representation Theory.

## CONCLUSION

For the foregoing reasons, the decision below should be reversed insofar as it denied summary judgment on claims predicated on L&L's legal advice and litigation conduct.

Respectfully submitted,

/s/ *Anton Metlitsky*

| | |
|---|---|
| DANNY S. ASHBY | ANTON METLITSKY |
| O'MELVENY & MYERS LLP | O'MELVENY & MYERS LLP |
| 2801 N. Harwood Street, | 1301 Avenue of the Americas, |
| Suite 1600 | Suite 1700 |
| Dallas, Texas 75201 | New York, NY 10019 |
| Tel: (972) 360-1904 | Tel: (212) 326-2291 |
| dashby@omm.com | ametlitsky@omm.com |

LEAH GODESKY
L. NICOLE ALLAN
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Tel: (310) 246-8501
lgodesky@omm.com
nallan@omm.com

*Counsel for Planned Parenthood Federation of America, Inc., Defendant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, an electronic copy of the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit and served on counsel for Plaintiff-Appellee using the appellate CM/ECF system.

/s/ *Anton Metlitsky*
Anton Metlitsky

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit and the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,911 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(7)(B)(i) and Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally-spaced typeface using Microsoft Word in size 14 font in Times New Roman.

/s/ *Anton Metlitsky*
Anton Metlitsky
Counsel for Defendant-
Appellant Planned Parenthood
Federation of America, Inc.

Dated:  July 28, 2025