# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 23-11184

UNITED STATES OF AMERICA, ex rel., ALEX DOE, Relator,

*Plaintiff-Appellee,*

v.

PLANNED PARENTHOOD FEDERATION
OF AMERICA, INCORPORATED,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, AMARILLO

## EN BANC REPLY BRIEF FOR DEFENDANT-APPELLANT

DANNY S. ASHBY
O'MELVENY & MYERS LLP
2801 North Harwood Street,
   Suite 1600
Dallas, Texas 75201
(972) 360-1904
dashby@omm.com

ANTON METLITSKY
O'MELVENY & MYERS LLP
1301 Avenue of the Americas,
   Suite 1700
New York, New York 10019
(212) 326-2291
ametlitsky@omm.com

LEAH GODESKY
L. NICOLE ALLAN
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, California 90067
(310) 246-8501
lgodesky@omm.com
nallan@omm.com

*Attorneys for Defendant-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Defendant-Appellant:**

Planned Parenthood Federation of America, Inc.
*Represented by* O'Melveny & Myers LLP
Anton Metlitsky
Leah Godesky
Danny S. Ashby
L. Nicole Allan

**Plaintiff-Appellee:**

Relator Alex Doe
*Represented by* Hacker Stephens LLP
Heather Gebelin Hacker
Andrew Bowman Stephens

**Other Parties:**

Defendant Planned Parenthood of Greater Texas, Inc.
Defendant Planned Parenthood Gulf Coast, Inc.
Defendant Planned Parenthood South Texas, Inc.
Defendant Planned Parenthood Cameron County, Inc.
Defendant Planned Parenthood San Antonio, Inc.
*Represented by* Arnold & Porter Kaye Scholer LLP
Christopher M. Odell
Craig D. Margolis
Tirzah S. Lollar
Paula R. Ramer
Alyssa Gerstner
Christian Sheehan

Emily Reeder-Ricchetti
Megan Pieper
Meghan Martin
Marcus Asner
Matthew Diton
Valarie Hays
Jayce Lane Born

*Represented by* Law Office of Blackburn & Brown, LLP
Ryan Patrick Brown

Plaintiff State of Texas (Amicus in Support of Plaintiff-Appellee on Appeal)
*Represented by* Office of the Attorney General
Ken Paxton
Amy S. Hilton
William David Wassdorf
Brent Webster

*Represented by* Office of the Attorney General, Solicitor General Division
Willaim R. Peterson
Beth Klusmann

United States of America, Real Party in Interest (Amicus in Support of Plaintiff-Appellee on Appeal)
*Represented by* United States Attorney's Office
Kenneth G. Coffin
J. Scott Hogan
Jamie Yavelberg
Nancy E. Larson

*Represented by* Office of the Attorney General
Brett A. Shumate

*Represented by* United States Department of Justice, Civil Division
Michael S. Raab
Charles W. Scarborough
Benjamin C. Wei

State of Louisiana, Real Party in Interest
*Represented by* Office of the Louisiana Attorney General
    Joseph Scott St. John

First Liberty Institute (Amicus in Support of Plaintiff-Appellee on Appeal)
*Represented by* First Liberty Institute
    Kelly J. Shackelford
    Jeffrey C. Mateer
    Hiram S. Sasser, III
    Keisha Russell

Texas Public Policy Foundation (Amicus in Support of Plaintiff-Appellee on Appeal)
*Represented by* Texas Public Policy Foundation
    Robert Henneke
    Chance Weldon

Law Professors and Ethics Professionals (Amicus in Support of Defendant-Appellant on Appeal):
    S. Alan Childress
    Renee Knake Jefferson
    David Luban
    Milan Markovic
    Ellen A. Panksy

*Represented by* Botkin Chiarello Calaf, PLLC
    Jennifer Rappoport
    Katherine P. Chiarello
    Christine Roseveare

/s/ *Anton Metlitsky*
Anton Metlitsky

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................i

INTRODUCTION ....................................................................1

ARGUMENT .........................................................................3

    I.    THIS COURT HAS JURISDICTION OVER PPFA'S APPEAL.......3

        A.    Attorney Immunity Is An Immunity From Suit........................3

            1.    *Troice* Should Not Be Overruled....................................3

            2.    This Court Has Jurisdiction Over PPFA's Assertions Of Federal And Louisiana Immunity ...........7

            3.    That PPFA's Claim Of Attorney Immunity Does Not Defeat All Of Relator's Claims Does Not Deprive This Court Of Jurisdiction .................................8

    II.    RELATOR'S CLAIMS ARE BARRED INSOFAR AS THEY RELY ON ATTORNEY CONDUCT................................................10

        A.    The FCA Does Not Abrogate Common-Law Attorney Immunity................................................................................10

        B.    The TMFPA Does Not Abrogate Common-Law Attorney Immunity................................................................................17

        C.    The LMAPIL Does Not Abrogate Common-Law Attorney Immunity................................................................19

        D.    Relator Cannot Defend The District Court's Respondeat Superior Holding...................................................................20

        E.    PPFA Showed That The Alleged Conduct At Issue Fell Within The Scope Of Representation .....................................25

CONCLUSION........................................................................27

CERTIFICATE OF SERVICE ..................................................29

CERTIFICATE OF COMPLIANCE..........................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. Brain*,
910 F.3d 502 (9th Cir. 2018) ...................................................................................14

*Alpert v. Crain, Caton & James, P.C.*,
178 S.W.3d 398 (Tex. App. 2005) ...........................................................................27

*Behrens v. Pelletier*,
516 U.S. 299 (1996) ................................................................................................10

*Briscoe v. LaHue*,
460 U.S. 325 (1983) ................................................................................................10

*Butz v. Economou*,
438 U.S. 478 (1978) .............................................................................................6, 10

*Cantey Hanger, LLP v. Byrd*,
467 S.W.3d 477 (Tex. 2015) ............................................................................. passim

*Diogu as next friends of DKKD v. Leva*,
2024 WL 4119915 (5th Cir. May 2, 2024) ................................................... 5, 6, 7

*Diogu v. Aporn*,
2018 WL 3233596 (Tex. App. July 3, 2018) ........................................................4, 5

*Ferri v. Ackerman*,
444 U.S. 193 (1979) ........................................................................................ 11, 12

*Flanagan v. United States*,
465 U.S. 259 (1984) ..................................................................................................6

*Frizzell v. Cook*,
790 S.W.2d 41 (Tex. App. 1990) ............................................................................18

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ..................................................................................................4

*Haynes & Boone, LLP v. NFTD, LLC*,
631 S.W.3d 65 (Tex. 2021) ....................................................................................5, 7

*Heffernan v. Hunter*,
189 F.3d 405 (3d Cir. 1999) ....................................................................................11

*Heintz v. Jenkins*,
514 U.S. 291 (1995) ................................................................................................13

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999) ............................................................................14

*Ironshore Europe DAC v. Schiff Hardin, L.L.P.*,
    912 F.3d 759 (5th Cir. 2019) ...............................................................3

*Kelly v. Nichamoff*,
    868 F.3d 371 (5th Cir. 2017) ...............................................................3

*Legacy Recovery Servs., L.L.C. v. City of Monroe*,
    2024 WL 4689054 (5th Cir. Nov. 6, 2024) ......................................8, 9

*Lucio v. Lumpkin*,
    987 F.3d 451 (5th Cir. 2021) ...............................................................3

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Ints.*,
    991 S.W.2d 787 (Tex. 1999) ..............................................................23

*Mi Familia Vota v. Ogg*,
    105 F.4th 313 (5th Cir. 2024) ............................................................10

*Midland Asphalt Corp. v. United States*,
    489 U.S. 794 (1989) .............................................................................6

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985) .............................................................................5

*Montalvo v. Sondes*,
    637 So. 2d 127 (La. 1994) .............................................................19, 24

*Nat'l Sav. Bank of D.C. v. Ward*,
    100 U.S. 195 (1879) .......................................................................10, 24

*NFTD, LLC v. Haynes & Boone LLP*,
    652 S.W.3d 546 (Tex. App. 2022).................................................4, 5, 27

*Nix v. O'Malley*,
    160 F.3d 343 (6th Cir. 1998)..............................................................14

*Sayyed v. Wolpoff & Abramson*,
    485 F.3d 226 (4th Cir. 2007)........................................................13, 14

*Speeg v. Stewart Title Guar. Co.*,
    377 So. 2d 589 (La. Ct. App. 1979).....................................................8

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Steffes v. Stepan Co.*,
144 F.3d 1070 (7th Cir. 1998) ..................................................... 11, 14

*Troice v. Greenberg Traurig, L.L.P.*,
921 F.3d 501 (5th Cir. 2019).................................................... 17, 18

*Troice v. Proskauer Rose, L.L.P.*,
816 F.3d 341 (5th Cir. 2016)................................................... passim

*U.S. ex rel. Citynet, LLC v. Gianato*,
962 F.3d 154 (4th Cir. 2020)...............................................15

*U.S. ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023)...............................................14

*United States v. Texas*,
507 U.S. 529 (1993) ........................................................ 12, 13

*Yaselli v. Goff*,
275 U.S. 503 (1927), *aff'g*, 12 F.2d 396 (2d Cir. 1926) .....................10

**Statutes**

28 U.S.C. § 1291 ..............................................................8

42 U.S.C. § 1983 ..............................................................12

Tex. Bus. & Commerce Code § 17.41 ...............................................18

Tex. Gov. Code, Title 12 ........................................................18

Tex. Hum. Res. § 36.004 .........................................................18

Tex. Hum. Res. § 36.005 ...................................................... 18, 19

Tex. Hum. Res. § 36.006 .........................................................19

# INTRODUCTION

Relator's answering brief confirms the panel's conclusion that PPFA is entitled to attorney immunity.

Relator first argues that this Court lacks jurisdiction, contending for the first time that this Court's decision in *Troice v. Proskauer Rose, L.L.P.*, [816 F.3d 341](5th Cir. 2016), has been superseded and should be overruled. But if anything, Texas precedent post-dating *Troice* has *confirmed Troice*'s main holding—*viz.*, that Texas attorney immunity is not merely a defense against liability but an immunity from suit, such that a denial of attorney immunity is an appealable collateral order. That same principle applies to attorney immunity under federal and Louisiana law.

Relator's merits arguments are equally weak. Relator does not dispute the existence of a longstanding common-law attorney immunity, but argues that the FCA overrides it. In support, he cites cases involving modern, complex, reticulated statutes like ERISA and the Federal Debt Collection Procedures Act ("FDCPA") that either expressly override attorney immunity or leave no room for common-law defenses. But those cases prove PPFA's point—the FCA, unlike those statutes, is a simple common-law fraud prohibition. Relator makes no effort to explain why a common-law fraud statute should be read to override common-law immunities—especially when the near-contemporaneous Section 1983 has been construed to adopt them. Relator's argument under Texas law, meanwhile, ignores

the wall of precedent holding that fraud statutes *more* complex than the TMFPA do not override attorney immunity. And his argument under Louisiana law simply mischaracterizes the scope of Louisiana attorney immunity.

Finally, Relator's contention that attorney immunity does not apply because PPFA employs L&L's attorneys and the allegedly unlawful litigation strategy furthered PPFA and the Affiliate Defendants' shared mission mischaracterizes the factual record and is wrong as a matter of law. Relator ignores, but cannot contest, the uncontroverted evidence that L&L attorneys have separate duties of loyalty and confidentiality to each of their clients, and represented the Affiliate Defendants—not PPFA—in conjunction with the Medicaid terminations. And there is no precedent for excluding from the scope of attorney immunity litigation by mission-driven institutions who employ attorneys to represent third-party clients just because the litigation furthers the institution's mission.

If anything, attorney immunity is all the more important in that context; without it, lawyers and their mission-driven employers would become targets of their ideological opponents simply for formulating legal strategies and otherwise representing their clients, as this case amply demonstrates. There is no precedent for that sort of litigation—under the FCA or otherwise—precisely because attorney immunity has always precluded it. The only way to prevent this case from becoming

a model for this new form of ideological lawfare is to confirm that attorney immunity applies here.

## ARGUMENT

## I. THIS COURT HAS JURISDICTION OVER PPFA'S APPEAL.

Relator contends that this Court lacks appellate jurisdiction for three reasons: (i) PPFA lacks a "substantial" entitlement to immunity on the merits, Relator Br. ("RB") 23-26; (ii) attorney immunity is a defense to liability rather than an immunity from suit, RB 26-30, and (iii) this appeal will not resolve all of Relator's claims against PPFA, RB 31-33. The first objection is discussed in Part II, which explains why PPFA is in fact entitled to attorney immunity here. The second and third objections fail for the reasons explained directly below.

### A. Attorney Immunity Is An Immunity From Suit.

#### 1. *Troice* Should Not Be Overruled.

Relator does not dispute that this Court held in *Troice* that it has collateral-order jurisdiction over a Texas attorney-immunity denial. *See* 816 F.3d at 345. That principle has been affirmed by at least three panels of this Court. *See id.*; *Kelly v. Nichamoff*, 868 F.3d 371, 373-74 (5th Cir. 2017); *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019). Relator now argues that *Troice* should be overruled in light of intervening Texas law. That argument is (i) forfeited because it was not raised before the panel, *see Lucio v. Lumpkin*, 987 F.3d 451, 478 (5th Cir. 2021) (en banc), and (ii) wrong.

**a.**  This Court explained in *Troice* that whether there is collateral-order jurisdiction over an attorney-immunity denial turns on whether the doctrine "provides a true immunity from suit and not a simple defense to liability."  816 F.3d at 345.  The Court held that Texas "attorney immunity is properly characterized as a true immunity from suit, not as a defense to liability," *id*. at 346, because like other immunities supporting collateral-order jurisdiction, attorney immunity has the "objective of safeguarding the unfettered exercise of judgment in the judicial system by protecting the person exercising it not only against liability but also against incurring the costs of defending a lawsuit," *id*.; *see also* PPFA Opening Br. ("OB") 49-50.

Relator contends that *Troice* is no longer good law because two Texas intermediate appellate decisions have since held that attorney immunity is an affirmative defense rather than a "jurisdictional bar" to suit.  RB 27 (quoting *NFTD, LLC v. Haynes & Boone LLP*, 652 S.W.3d 546, 559 (Tex. App. 2022); *Diogu v. Aporn*, 2018 WL 3233596, at *5 (Tex. App. July 3, 2018)).  But as *Troice* held, "describing something as an affirmative defense simply indicates who bears the burden of proof; it does not indicate that it is a simple defense to liability."  816 F.3d at 347.  To take one obvious example, "'[q]ualified … immunity is an affirmative defense," *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982), but it also "is an *immunity from suit* rather than a mere defense to liability" so its denial is an appealable

-4-

collateral order, *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). That attorney immunity is not a "jurisdictional bar" means only that it does not implicate courts' "subject-matter jurisdiction"; it has nothing to do with whether attorney immunity operates as an immunity from suit. *Diogu*, 2018 WL 3233596, at *4. And as to *that* question, Relator's own case provides the answer (citing the Texas Supreme Court): "Attorney immunity exists to promote such 'loyal, faithful, and aggressive representation' by alleviating in the mind of the attorney any fear *that he or she may be sued by* or held liable to a non-client for providing such zealous representation." *NFTD*, 652 S.W.3d at 555 (quoting *Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 79 (Tex. 2021)) (emphasis added). Rather than undermining *Troice*, later-in-time Texas opinions confirm *Troice*'s core holding.

**b.** Relator also relies on this Court's unpublished opinion in *Diogu as next friends of DKKD v. Leva*, 2024 WL 4119915, at *1 (5th Cir. May 2, 2024), which dismissed an attorney-immunity-based appeal for lack of jurisdiction. Unpublished opinions have no precedential force, and there are three especially good reasons not to follow *Diogu*.

*First*, that opinion—which was decided on a motion to dismiss, without argument, ten days after the opposition to the motion was filed, *see Diogu as next friends of DKKD v. Leva*, No. 24-20093, Dkts. 15 & 26 (5th Cir.)—did not even cite, let alone discuss, *Troice* or its progeny. That is unsurprising, because the briefs did

not discuss those cases either. *Id.* Dkt. 15. An unpublished, non-precedential opinion without adequate briefing that does not cite the relevant binding precedent carries little-to-no persuasive weight.

*Second*, the per curiam opinion is incorrect in stating that for the collateral-order doctrine to apply in an immunity case, there must be "an explicit statutory or constitutional guarantee that trial will not occur." *Diogu*, 2024 WL 4119915, at *2 (quotation omitted). But the quoted language originated in a *criminal* case, *Midland Asphalt Corp. v. United States*, 489 U.S. 794 (1989), which is a context where the Court has "interpreted the collateral order exception 'with the utmost strictness.'" *Id.* at 799 (quoting *Flanagan v. United States*, 465 U.S. 259, 265 (1984)). And in that criminal context, a "right not to be tried … rests upon an explicit statutory or constitutional guarantee that trial will not occur—as in the Double Jeopardy Clause … or the Speech or Debate Clause." *Id.* at 801. This rule has no application in civil cases—for example, qualified immunity is neither constitutionally required nor provided for by statute, *see Butz v. Economou*, 438 U.S. 478, 503 (1978), but a qualified-immunity denial is a collateral order. *Troice* correctly held that an attorney-immunity denial is immediately appealable for the same reasons. *See* 816 F.3d at 347.

*Third*, *Diogu* cited a Texas Supreme Court opinion that described "the attorney immunity doctrine as 'protecting attorneys from *liability* to non-clients.'"

[2024 WL 4119915](), at *2 (quoting *Cantey Hanger, LLP v. Byrd*, [467 S.W.3d 477, 481]() (Tex. 2015)). *Troice* considered *Cantey Hanger* at length and determined that it *supported* a collateral-order finding. *See Troice*, [816 F.3d at 346](). In any event, *Diogu* neglected to cite the Texas Supreme Court's recent opinion in *Haynes & Boone, LLP*, which expressly held that attorney immunity is not only a defense against liability but *also* an immunity from suit, because its purpose is "alleviating in the mind of the attorney any fear that he or she *may be sued by* or held liable to a non-client." [631 S.W.3d at 79]() (emphasis added). It is not surprising that an unpublished opinion decided with barely any briefing overlooked this decision, but that is all the more reason not to follow it and instead to reaffirm *Troice*.

### 2. This Court Has Jurisdiction Over PPFA's Assertions Of Federal And Louisiana Immunity.

**a.** As PPFA's opening brief explained, the attorney-immunity doctrines recognized under Louisiana and federal common law (OB 51-52, *infra* at 8) likewise "provide[] a true immunity from suit and not a simple defense to liability." *Troice*, [816 F.3d at 345]() (citation omitted). This Court thus also has collateral-order jurisdiction over the denial of those immunities. OB 51-53; Dkt. 120-1 at 8-11 (panel op.).

Relator's responses lack merit. Relator argues that a denial of Louisiana attorney immunity is not a collateral order in *federal* court because Louisiana generally does not allow interlocutory appeals. RB 28. Relator's premise is

wrong—Louisiana courts have recognized the collateral-order doctrine. *See, e.g.*, *Speeg v. Stewart Title Guar. Co.*, 377 So. 2d 589, 592 (La. Ct. App. 1979). That they have yet to decide whether an attorney-immunity denial qualifies is irrelevant. And in any event, whether such a denial is a collateral order in *federal* court turns on *federal* law. *See* 28 U.S.C. § 1291. The answer to that question is yes for the reasons explained by the panel (Dkt. 120-1 at 6-11) and PPFA's opening brief (OB 51-52).

As to federal law, Relator's only argument is that the FCA overrides attorney immunity. RB 28. That is wrong for the reasons explained below. *See infra* at 10-17. Relator offers no answer to PPFA's argument for why attorney immunity under federal law is an immunity from suit, not just a defense to liability. OB 51-52.

**b.** As PPFA's opening brief explained, even if the Louisiana and federal attorney-immunity defenses were not immunities from suit, the Court still would have pendent jurisdiction to consider them. OB 53-54. Relator offers no response.

### 3. That PPFA's Claim Of Attorney Immunity Does Not Defeat All Of Relator's Claims Does Not Deprive This Court Of Jurisdiction.

Relator also argues that this Court lacks jurisdiction because PPFA's attorney-immunity appeal would not resolve Relator's other claims against PPFA (i.e., those based on Relator's Control Theory, *see* OB 14). For that proposition, Relator relies on this Court's unpublished opinion in *Legacy Recovery Services, L.L.C. v. City of*

*Monroe*, 2024 WL 4689054, at \*3 (5th Cir. Nov. 6, 2024). *Legacy Recovery* does not support Relator's argument, and other binding precedent forecloses it.

The district court in *Legacy Recovery* had granted the defendant's motion to dismiss as to some but not all claims, and the plaintiff sought immediate appellate review of the dismissed claims. *See id.* at \*1. The Court dispatched that frivolous appeal in a short per curiam opinion for many reasons, including the two Relator focuses on—*viz.*, that (i) the issues on appeal were not "completely separate from the merits" (as required for collateral-order jurisdiction) because "the issues resolved are interwoven with the issues left for disposition before the district court," and (ii) "the order … will be easily reviewable on appeal from a later final judgment without jeopardizing any important right of the appellants." *Id.* at \*3-4.

The question here, in contrast, is whether denial of a *defendant's* assertion of attorney *immunity* is a collateral order. As just explained, this Court has already held that it is, because, unlike the partial grant of a motion to dismiss, a denial of attorney immunity *is* "separate from the merits of the action," *Troice*, 816 F.3d at 345, and *does* deprive the defendant of "an immunity from suit" as to claims implicating attorney conduct, *id.* at 346, which cannot be remedied after the defendant has already been required to litigate those claims, *see id.* at 345-47. And it is well-established that when one or more of a plaintiff's claims implicates an immunity from suit, a denial of that immunity is immediately appealable *even if the appeal*

-9-

*does not dispose of all claims. See Behrens v. Pelletier*, 516 U.S. 299, 312 (1996) ("when immunity with respect to [some] claims has been finally denied, appeal must be available, and cannot be foreclosed by the mere addition of other claims [to which immunity does not apply] to the suit"); *Mi Familia Vota v. Ogg*, 105 F.4th 313, 324 (5th Cir. 2024) (explaining that *Behrens* recognized "a right to appeal the denial of [qualified] immunity when asserted as to fewer than all claims," and holding the same rule applies to sovereign immunity).

## II. RELATOR'S CLAIMS ARE BARRED INSOFAR AS THEY RELY ON ATTORNEY CONDUCT.

On the merits, Relator's contention that attorney immunity does not apply here is wrong for numerous reasons.

### A. The FCA Does Not Abrogate Common-Law Attorney Immunity.

Relator acknowledges the "general principle at common law in favor of at least some degree of immunity for attorneys from civil claims by those adverse to the attorney's client." RB 25. That is a substantial understatement. The "general principle" to which Relator refers has been applied (*see Nat'l Sav. Bank of D.C. v. Ward*, 100 U.S. 195, 202 (1879)) and otherwise acknowledged (*see, e.g.*, *Butz*, 438 U.S. at 512; *Briscoe v. LaHue*, 460 U.S. 325, 334-35 (1983); *Yaselli v. Goff*, 275 U.S. 503 (1927), *aff'g*, 12 F.2d 396, 404 (2d Cir. 1926)) by the Supreme Court. *See* OB 29-30; *contra* RB 34-35 (arguing federal courts have not recognized attorney immunity). It has been applied by lower federal courts. *See, e.g.*, *Heffernan v.*

*Hunter*, [189 F.3d 405, 413](#) (3d Cir. 1999) (attorney "immunity" applies under [42 U.S.C. § 1985](#) unless "challenged conduct occurs outside the scope of representation"); *Steffes v. Stepan Co.*, [144 F.3d 1070, 1075](#) (7th Cir. 1998) ("the common-law litigation privilege, traditionally understood, applies to attorneys, witnesses, judges, and other participants in judicial proceedings"). It has repeatedly been applied by state courts to federal causes of action. OB 31. And it has generally been recognized by state courts under state law. *Id.*; *Steffes*, [144 F.3d at 1075](#) ("looking to state law to provide the content of a federal litigation privilege takes advantage of the states' richer bodies of common law and serves to minimize the number of different legal rules to which people are subject" (quotations omitted)). As the panel here explained, "[i]f private attorneys did not have immunity for their activities within the scope of litigation, they would be subject to suit from a third party every time they represent an unpopular client or advance an unpopular issue," creating a "chilling effect … on private attorneys' willingness to participate in unpopular cases." Dkt. 120-1 at 17.

Unlike Relator, the United States does contest the existence of federal attorney immunity, relying on *Ferri v. Ackerman*, [444 U.S. 193](#) (1979). *See* U.S.Am.Br. 8-15. But *Ferri* proves the opposite point. That case rejected a criminal defense attorney's assertion of immunity from a "*malpractice* suit brought against him *by his former client*." *Ferri*, [444 U.S. at 194](#) (emphasis added). Of course it

-11-

did—attorney immunity is immunity from suits by *non-clients*. OB 19, 22. As to *that* immunity, *Ferri* expressly "d[id] *not* address the question whether defense counsel is immune from other kinds of tort suits," including "a defamation action *brought by someone other than his client*," and cited *Butz* as having recognized such immunity. *Id.* at 204 n.22 (emphasis added). PPFA agrees with the United States that a "finding of immunity must rest on the immunity historically accorded the relevant official at common law," U.S.Am.Br. 11, and attorney immunity easily fits the bill, as *Ferri* implicitly recognizes.

Indeed, Relator in the end concedes that "attorney immunity" *would* apply to other "statutory cause[s] of action." RB 40. Relator's only argument here is that the FCA overrides that immunity. *See* RB 34-37. But Relator fails to acknowledge the basic rule that "[s]tatutes which invade the common law" are presumed to retain "long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States v. Texas*, 507 U.S. 529, 534 (1993) (citation omitted). Nor does he explain why the FCA should be read to override common-law defenses and immunities when Section 1983—which was enacted less than a decade later—has been read by the Supreme Court to adopt those immunities. OB 43. Relator's only textual argument is that the FCA applies to "any person" who violates its terms, OB 34, but Section 1983 uses materially identical language, *see* 42 U.S.C. § 1983 ("Every person who …."), so that argument (which the district

court also invoked , ROA.46682) fails.  That is especially so with respect to Relator's theory here, which is that PPFA—through L&L lawyers representing the Affiliate Defendants in litigation—"caused" those Affiliates to file false claims, since any attorney providing legal advice does not "cause" her client to do anything.  *See* OB 41-42.

Relator also cites several federal cases holding that *other* statutes *do* override attorney immunity.  But the contrast between those statutes and the FCA only highlights Relator's error.

Take Relator's primary example—the FDCPA.  The Supreme Court held in *Heintz v. Jenkins*, 514 U.S. 291 (1995), that the FDCPA can apply to attorneys engaged in litigation.  That was in part because the statute applied to all "attempts" to "collect" debt and thus encompassed collection through "legal proceedings," but also because "Congress [had] enacted an earlier version of this statute, which contained an express exemption for lawyers," then later "repealed this exemption in its entirety."  *Id.* at 294.  That statutory language and history more than suffices to demonstrate an "evident" "statutory purpose" to override attorney immunity.  *Texas*, 507 U.S. at 534.  The FCA's language and history contains nothing similar.  Relator also cites *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226 (4th Cir. 2007), which held that because Congress in the FDCPA (unlike Section 1983) created a "'comprehensive and reticulated' statutory scheme, involving clear definitions,

precise requirements, and particularized remedies," it is "clear that Congress meant not to incorporate common law immunities in this area." *Id.* at 233 (citation omitted). Unlike the FDCPA, however, the FCA creates a "fraud statute" with "common-law roots" whose "text … tracks the common law." *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749, 750 (2023). There is no plausible reason why Congress would have enacted a "common-law" "fraud statute" with text that "tracks the common law" if it intended to override common-law immunities.[1] Certainly,

---

[1] Relator's reliance on a Ninth Circuit decision holding that ERISA overrides attorney immunity similarly proves PPFA's point. *See Acosta v. Brain,* 910 F.3d 502 (9th Cir. 2018). Of course ERISA overrides the common law: "because ERISA is a comprehensive and reticulated statute, and is enormously complex and detailed, it should not be supplemented by extratextual remedies, such as … common-law doctrines." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999) (internal quotations omitted). The FCA, a common-law fraud statute, is nothing like ERISA. Relator's reliance on a Sixth Circuit case holding that the federal wiretap statute overrides attorney immunity is even further off-point. The attorney conduct in that case "exceed[ed] the boundaries of any attorney immunity because the disclosures were tangential to [the client's] defense." *Nix v. O'Malley*, 160 F.3d 343, 353 (6th Cir. 1998). In *Steffes*, meanwhile, it was the *client* rather than the *attorney* who was attempting to invoke attorney immunity. 144 F.3d at 1075. And while *Steffes* also held that the full scope of attorney immunity does not apply under Title VII and the ADA because such immunity could in some circumstances "interfere with the policies underlying the anti-retaliation provisions of" those statutes, the court also "hasten[ed] to add … that it will be the rare case in which conduct occurring within the scope of litigation constitutes retaliation prohibited by these statutes." *Id.* In particular, the court held that "litigation tactics subject to supervision by the court cannot constitute independent grounds of liability." *Id.* at 1076. If anything, *Steffes* supports PPFA's position and undermines Relator's.

there is no plausible reason to read the FCA differently than Section 1983 in this respect.

Relator's remaining arguments for why the FCA overrides attorney immunity similarly fail. Relator cites cases holding qualified immunity does not apply to the FCA. RB 36. But that is because the FCA applies "only where a person has acted *intentionally* or *recklessly*," and by so acting "a government official necessarily forfeits any entitlement to qualified immunity." *U.S. ex rel. Citynet, LLC v. Gianato*, 962 F.3d 154, 159 (4th Cir. 2020). "Thus, the state of mind required to establish liability under the FCA … preclude[s] immunity protection." *Id.* at 160. There is no similar textual or practical incompatibility between the FCA and attorney immunity.

Relator also argues that attorney immunity should not apply under the FCA because the FCA is a fraud statute. RB 36-37. To the contrary, the fact that the FCA codifies common-law fraud is an additional reason to conclude that it *does* incorporate common-law immunities and defenses so long as those immunities and defenses are not inconsistent with the statute. And there is no incompatibility between attorney immunity and allegations of fraud: "Fraud is not an exception to attorney immunity; rather, the defense does not extend to fraudulent conduct that is outside the scope of an attorney's legal representation of his client." *Cantey Hanger*, 467 S.W.3d at 484.

Relator's assertion that recognizing attorney immunity would let "Medicaid fraudsters simply rout[e] their fraud through in-house attorneys" (RB 37) misunderstands how attorney immunity works.[2]  As explained in PPFA's opening brief (without rebuttal from Relator), attorney immunity would not immunize *even one* defendant who has submitted a false claim.  It would only prevent the attorney advice and representation—as opposed to the submission of the false claim—from being actionable.  OB 47-48.  The fact that Relator cannot cite a single case in the FCA's history even suggesting the type of litigation-strategy-as-fraud theory of liability he presses here nullifies his contention that recognizing attorney immunity would undermine in any way the FCA or its antifraud purpose.

Moreover, Relator's description of the Affiliate Defendants' litigation strategy as fraud is, with respect, preposterous.  Two federal district courts agreed with Affiliate Defendants and granted preliminary injunctions.  Two panels of this Court affirmed, allowing the Affiliates to continue serving Medicaid patients for years.  OB 10-11.  This Court denied en banc review in one case but eventually granted it in the other.  Had it not, the injunctions would have remained in place even longer.  And as Relator continues to ignore, PPGC *remains* a Louisiana Medicaid

---

[2] Nor does the in-house attorney analogy work for L&L, which represented the Affiliates—*not* PPFA—in connection with the Medicaid terminations, and which has separate duties of loyalty and confidentiality to each client. ROA.18284-18285.

participant. A litigation strategy that multiple federal courts agreed with over the course of several years cannot plausibly be described as fraud.

Finally, Relator has no adequate response to the basic point that reading the FCA to apply to litigation and the lobbying of state administrative agencies would implicate serious First Amendment concerns. OB 43-47 (discussing the *Noerr-Pennington* doctrine). Relator's only answer is that the Affiliate Defendants could have used the state administrative process rather than federal-court litigation to challenge their Medicaid terminations. RB 37. But that response highlights rather than answers the problem: The First Amendment *protects* parties' ability to petition federal courts and administrative agencies for relief, which is exactly why courts have routinely construed broad criminal and civil prohibitions (including fraud prohibitions) *not* to apply to such conduct. *See* OB 43-47. Relator offers no basis for construing the FCA differently.

### B. The TMFPA Does Not Abrogate Common-Law Attorney Immunity.

Under Texas law, "[s]tatutes purporting to abrogate common law principles … must do so either expressly or by 'necessary implication.'" *Troice v. Greenberg Traurig, L.L.P.*, 921 F.3d 501, 507 (5th Cir. 2019). Relator acknowledges that the Legislature's use of "any person" does not satisfy that standard. RB 38. Relator's arguments that the TMFPA nevertheless overcomes the strong presumption in favor of retaining common-law immunities fail.

*First*, Relator again argues that the TMFPA's anti-fraud purpose is inconsistent with attorney immunity. That contention is wrong for the reasons just explained with respect to the FCA. *See supra* at 15-16. It also ignores the fact that this Court and Texas courts have held that the Texas Securities Act and the Texas Deceptive Practices Act—both antifraud statutes—do not override attorney immunity. *See Troice*, 921 F.3d at 507 (Securities Act); *Frizzell v. Cook*, 790 S.W.2d 41, 45 (Tex. App. 1990) (Deceptive Practices Act). Relator adds that the TMFPA is "comprehensive" and "detailed," OB 38-39, but that does not distinguish it from either the Securities Act (*see* Tex. Gov. Code, Title 12) or the Deceptive Practices Act (*see* Tex. Bus. & Commerce Code § 17.41 *et seq.*).

*Second*, Relator also cites particular provisions of the TMFPA that he contends are somehow inconsistent with attorney immunity. But even a cursory review of those provisions demonstrates the weakness of Relator's position. Relator first cites Section 36.004 (RB 38), which says that a person who "provid[es] access to documentary material under" the statute to certain government officials cannot be held liable civilly or criminally. Tex. Hum. Res. § 36.004. This has nothing to do with overriding common-law immunities generally, or attorney immunity in particular. Relator also cites Section 36.005(c), which provides that a person who is licensed by the state can face professional discipline for violating the Act. RB 38-39. But the provision Relator cites applies to licensed healthcare providers, *see* Tex.

Hum. Res. § 36.005(a)-(g); he cites nothing for the *ipse dixit* that it applies to attorneys, let alone attorneys being subject to liability for representing their clients. Finally, Relator cites Section 36.006 (RB 39), which says the Act "does not preclude the application of another common law, statutory, or regulatory remedy." Tex. Hum. Res. § 36.006. A provision that expressly does *not* override common-law remedies cannot be read to override common-law immunities and defenses.[3]

### C. The LMAPIL Does Not Abrogate Common-Law Attorney Immunity.

Relator's only argument as to the LMAPIL is that Louisiana attorney immunity does not apply to fraud, citing *Montalvo*. RB 40. That is not what *Montalvo* holds. Rather, that case—which does not discuss fraud—holds that while Louisiana attorney immunity does not apply to "intentional tort[s]," "an intentional tort in the context of an attorney's actions" is not the same as a "traditional intentional tort." *Montalvo v. Sondes*, 637 So. 2d 127, 130 (La. 1994). In particular, "[i]t is clear that the mere filing of a lawsuit, even if the suit appears meritless on its face, is not enough." *Id.* And the principal act by L&L that Relator says violated

---

[3] Texas argues that attorney immunity does not apply here because "the allegedly unlawful conduct—filing a Medicaid claim with an implied false certification—is not an adversarial process." Tex.Am.Br. 6. But the "allegedly unlawful conduct" at issue here is L&L's legal representation of the Affiliates; had PPFA filed Medicaid claims, Relator would have no reason to pursue this tortured alternative liability theory.

the LMAPIL is advising PPGC to move to enjoin the termination in federal district court rather than pursuing the state administrative process. ROA.10327. That is just another way to describe filing a lawsuit. And indeed, that lawsuit was successful—a panel of this Court affirmed, resulting in a settlement that maintained PPGC's status as an approved Louisiana Medicaid provider. The suggestion that this conduct would fall under Louisiana's intentional-tort exception to attorney immunity is absurd. Certainly, Relator cites no case suggesting it would.

### D. Relator Cannot Defend The District Court's Respondeat Superior Holding.

Before the panel, Relator attempted to defend the district court's position that PPFA cannot invoke attorney immunity because L&L attorneys are not being sued directly. Relator now abandons that argument. Instead, Relator argues that PPFA cannot invoke attorney immunity because (i) PPFA allegedly directed L&L's actions, and (ii) non-attorneys were involved in what Relator describes as "PPFA's wrongdoing," i.e., formulating a successful litigation strategy to prevent Affiliate Defendants' termination from Medicaid through federal litigation. RB 41-47. That argument fails for several reasons.

*First*, the district court did not consider any of these arguments and instead simply held that attorney immunity cannot apply unless it is invoked by attorneys, even when non-attorneys are being sued on a respondeat superior theory for attorneys' conduct. ROA.46682. Relator does not defend that position, presumably

because it is indefensible, as the panel here correctly explained.  Dkt. 120-1 at 20-21.  This Court should thus reverse.  Relator offers no reason for the Court to go further.

*Second*, Relator's arguments do not support exposing PPFA to liability for its attorney-employees' legal advice and litigation conduct on behalf of Affiliate Defendants, which is all the immunity would cover.  Any allegations that "[n]on-lawyer employees were involved in PPFA's wrongdoing," RB 44, are not at issue in this appeal.  As for Relator's argument that PPFA "directed L&L's actions in its own interest," RB 41, it is factually baseless and legally irrelevant.

**a.**     The Affiliate Defendants all testified—and Relator has never rebutted—that they decided to challenge the Medicaid terminations in federal court because that strategy was in their interest.  *See* OB 9 (quoting ROA.20487; ROA.19911-19912; ROA.8680-8681); *see also* ROA.20232; ROA.20189.  Relator cites an email from PPGT representative Ken Lambrecht to support Relator's assertion that "*L&L* made the 'legal strategy decision,' in keeping with PPFA's wishes, for its affiliates to eschew [administrative] proceedings" in favor of federal litigation.  RB 42 (emphasis added).  But Lambrecht explained that *PPGT* made that decision because it believed the Medicaid termination was "politically motivated," stating:  "It was … what we felt we had to do to center our patients in our conversation."  ROA.20487.  This approach achieved PPGT's and the other Affiliate

Defendants' goals, allowing them to continue providing high-quality Medicaid services for four years in Texas, and PPGC to remain a provider in good standing in Louisiana to this day.[4]

That PPFA shared these goals is self-evident and non-controversial. As a membership organization comprised of its affiliates, PPFA and the affiliates share a mission of ensuring access to comprehensive reproductive and complementary healthcare services. ROA.18250; ROA.18276. If the member-affiliates wanted to change PPFA's mission, they could do so by amending its bylaws. ROA.20011. For this reason, Relator's arguments that the litigation strategy advised by L&L actually advanced PPFA's separate interests (RB 43-44) fall flat. Avoiding the Affiliate Defendants' terminations from Texas and Louisiana Medicaid so they could continue caring for low-income Texans and Louisianans was a primary goal of the Affiliate Defendants and PPFA. That non-lawyer PPFA employees attempted to advance this goal via public-relations or lobbying efforts does not strip the attorney contributions to this "multi-pronged" effort (RB 44) of longstanding common-law

---

[4] Relator's claim that the Affiliate Defendants agreed to this approach "[i]n exchange for … access to PPFA's multi-million-dollar fund to compensate them for any Medicaid losses incurred during the pendency of the litigation" (RB 43) is frivolous; it cites an email from 2017—nearly two years after the Affiliate Defendants filed the suits in question—about a "newly-established" PPFA fund to help affiliates "continue to provide care to Medicaid patients" in the event of a then-threatened Congressional defunding. ROA.23686.

protections, just as a press release issued by a non-lawyer employee of a law firm like Husch Blackwell LLP (L&L's co-counsel in the very litigation at issue here, ROA.24704-24705) would not strip the firm of immunity for legal services referenced in that press release.

Finally, Relator cites no evidence—because there is none—that anyone outside of L&L "determined what L&L's advice to the Affiliate Defendants would be." RB 42.[5] The undisputed record is that PPFA has no control over whether L&L represents an affiliate in a given matter or over what advice L&L gives (including whether to settle or defend claims, *see* Dkt. 83 (PPFA panel reply) at 17 n.4). ROA.20231-20232.

**b.** Relator and amici nonprofits imply that attorney immunity does not attach here because L&L's representation of Affiliate Defendants is somehow conflicted, *see* NonProfit.Am.Br. 8-9, but it is black-letter law that third parties cannot sue attorneys for allegedly conflicted representation. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Ints.*, 991 S.W.2d 787, 792 (Tex. 1999) ("an

---

[5] The only evidence Relator offers for the idea that PPFA controlled L&L's legal advice is testimony from PPFA's corporate representative that PPFA is "very much interested in ensuring" that its brand "is protected." ROA.20000. But this testimony referred to media talking points drafted by PPFA's assistant director for state policy media. ROA.19998-ROA.20000. It has nothing to do with L&L and certainly does not show that PPFA was influencing or directing the legal advice L&L provided the Affiliate Defendants.

attorney is not liable for malpractice to anyone other than her client"); *Montalvo*, 637 So. 2d at 130 (nonclient "cannot hold his adversary's attorney personally liable for either malpractice or negligent breach of a professional obligation"); *Ward*, 100 U.S. 195 (similar). And on a practical level, Relator's suggestion that a lawyer who pursues litigation that serves her employer's and client's broader mission forfeits attorney immunity for her employer would functionally strip immunity from organizations that employ attorneys who engage in cause-lawyering on behalf of third-party clients—a position Relator seems to disclaim, RB 40.

Amici nonprofits attempt to head off this conclusion by explaining that unlike L&L, which primarily represents PPFA and member-affiliates, they serve clients who have "no affiliation with the nonprofit." NonProfit.Am.Br. 4. L&L also represents third-party clients, such as the Medicaid beneficiaries in the underlying termination litigation. ROA.8594-8595. Regardless, this makes no difference under Relator's rule. Both amici nonprofits are mission-driven and employ attorneys who litigate on behalf of third-party clients to pursue their respective missions.[6] If such mission-driven litigation were not protected by attorney immunity as Relator contends, third parties who disagree with those missions could pursue litigation

---

[6] *Fighting for What Matters Most*, First Liberty, https://firstliberty.org/about-us/ (last visited Sept. 4, 2025); *Mission*, Texas Public Policy Foundation, https://www.texaspolicy.com/about/ (last visited Sept. 4, 2025).

against these organizations—just as Relator, who disagrees with PPFA's mission, has latched onto L&L's legal advice and representation to go after PPFA.

### E. PPFA Showed That The Alleged Conduct At Issue Fell Within The Scope Of Representation.

Lastly, Relator contends that PPFA failed to satisfy its burden of proving attorney immunity applies. RB 47-49. Not so.

PPFA agrees with Relator that it bears "the burden to prove that [L&L's] alleged wrongful conduct, regardless of whether it is labeled fraudulent, is part of the discharge of [L&L's] duties to [its] client," *Cantey Hanger*, 467 S.W.3d at 484— i.e., that the alleged conduct "was within the scope of [L&L's] legal representation of [the Affiliate Defendants] in the [termination] proceedings," *id.*; RB 47. PPFA easily satisfied that burden based on Relator's own allegations.

The "alleged wrongful conduct" Relator identified below is all self-evidently within the scope of L&L's representation of the Affiliate Defendants. Specifically, Relator argued at summary judgment that PPFA (through L&L) "caused" the Affiliate Defendants to violate the FCA and its analogues by "masterminding" a legal strategy involving (1) "steer[ing]" Affiliate Defendants into federal court; (2) helping them request a grace period from a Texas agency; (3) helping them file an "unsuccessful lawsuit in Travis County District Court"; (4) helping PPGC oppose Louisiana's request to vacate the *Kliebert* injunction post-*Kauffman*; and (5) "continu[ing] to represent and assist Affiliate Defendants" in the instant litigation.

ROA.10326-10327. Relator's conspiracy allegations were similar—that "PPFA" (i.e., L&L) and the Affiliate Defendants agreed "to *use the courts*, either by asking through [L&L] for relief they knew was unsupported or by avoiding updating the court as to developments directly impacting the legal basis for their claims, to extend the amount of time they could bill Medicaid under preliminary or temporary injunctions." ROA.10348 (emphasis added). PPFA's summary-judgment briefing took on and easily satisfied the burden of proving that these L&L actions fall "within the scope of [L&L's] legal representation" of the Affiliate Defendants, *Cantey Hanger*, 467 S.W.3d at 484. ROA.8568 (section titled "Every part of the 'strategy' Plaintiffs claim L&L 'masterminded' fell within the scope of L&L's representation of the Affiliate Defendants.").[7]

Relator's argument that PPFA failed to present evidence "explaining the contours of L&L's representation of the Affiliates" or showing that "L&L limited their work solely to legal services," RB 48, makes no sense. The legal question is whether "the *type* of conduct alleged falls" within the scope of L&L's representation. *Cantey Hanger*, 467 S.W.3d at 485. And Relator's own argument is that L&L

---

[7] Relator contends that PPFA failed to satisfy its burden with respect to the conspiracy claim. RB 49 n.11. But as just explained, and as the district court recognized, that claim—which Relator himself defined as turning on an agreement to "use the courts" (ROA.10348)—is predicated on the same "alleged litigation strategies, conduct, and legal maneuvering" underlying the other claims. ROA.48284.

caused the Affiliate Defendants to violate the FCA and its analogues by "represent[ing them]"—by which he means filing lawsuits, making legal arguments, and negotiating with the Affiliate Defendants' opponents—"in the underlying termination litigation and related matters." ROA.10326 (emphasis added). "L&L's coordination with PPFA executives, media representatives, and lobbyists, and helping write a letter requesting a 'grace period,'" RB 48, was all part of that representation effort.

The decision on remand in *Haynes & Boone* is thus easily distinguishable: there, the "claims were based on conduct that" was not self-evidently protected, like making misrepresentations "while socializing at a pub." *NFTD*, 652 S.W.3d at 558; RB 48. Relator's claims, by contrast, are based on alleged conduct—filing lawsuits and, indeed, arguing before this Court—that (obviously) is of the "type" that falls "within the scope of" L&L's representation of the Affiliate Defendants. *Cantey Hanger*, 467 S.W.3d at 485; *see, e.g., Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 408 (Tex. App. 2005) (immunity attaches to "the filing of lawsuits and pleadings, the providing of legal advice upon which the client acted, and awareness of settlement negotiations").

## CONCLUSION

The decision below should be reversed to the degree it denied summary judgment as to conduct predicated on L&L's legal advice and representation.

Respectfully submitted,

/s/ *Anton Metlitsky*
Anton Metlitsky
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Tel: (212) 326-2291
ametlitsky@omm.com

Danny S. Ashby
O'MELVENY & MYERS LLP
2801 N. Harwood Street
Dallas, TX 75201
Tel: (972) 360-1904
dashby@omm.com

Leah Godesky
L. Nicole Allan
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Tel: (310) 246-8501
lgodesky@omm.com
nallan@omm.com

*Counsel for Planned Parenthood Federation of America, Inc., Defendant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2025, an electronic copy of the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit as an attachment to Defendant-Appellant's Motion for Leave to File En Banc Reply Brief, both of which were served on counsel for Plaintiff-Appellee using the appellate CM/ECF system.


/s/ *Anton Metlitsky*
Anton Metlitsky

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit and the word limit of Fed. R. App. P. 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,492 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(7)(B)(i) and Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally-spaced typeface using Microsoft Word in size 14 font in Times New Roman.

/s/ *Anton Metlitsky*
Anton Metlitsky
Counsel for Defendant-
Appellant Planned Parenthood
Federation of America, Inc.

Dated: September 10, 2025